GEORGE CLINTON, *et al.*

        Plaintiffs,

vs.

ARMEN BOLADIAN, *et al.*,

        Defendants.

Case No. 499CV242-RH

---

BRIDGEPORT MUSIC, INC., a Michigan corporation, ARMEN BOLADIAN, an individual, SOUTHFIELD MUSIC, INC., a Michigan corporation, NINE RECORDS, INC., a Michigan corporation, and WESTBOUND RECORDS, INC., a Michigan corporation,

        Counterclaimants,

vs.

GEORGE CLINTON; STEPHANIE CLINTON; THE DOG IN ME, INC., a Florida corporation; and WHAT PRODUCTION COMPANY, INC., a Florida corporation,

        Counter-Defendants.

---

## DEFENDANTS' ANSWER AND COUNTERCLAIM

    Defendants Armen Boladian and Bridgeport Music, Inc., for their Answer to

Plaintiffs' complaint, state as follows:

- 36

1.     Admitted, except that Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation of residence.

2.     Denied in that the corporation was dissolved on December 30, 1981 and, to the knowledge of Defendants, is no longer an existing corporation.

3.     Admitted.

4.     Admitted.

5.     Admitted that Boladian owns music publishing companies. Otherwise, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation because of the failure to identify the corporations referred to.

6.     The Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation of diversity jurisdiction in that they are without knowledge of Clinton's citizenship. Denied that the Complaint states a basis for federal question jurisdiction in that it fails to allege facts giving rise to a cause of action under federal patent or copyright laws.

7.     Defendants voluntarily submit to the venue of this court.

8.     Denied that Clinton wrote any part of the compositions "Checkin You Checkin Yourself Out" and "Keep Me Burning." Admitted that Clinton wrote some or all of a number of the compositions listed on Schedule A. Otherwise, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation with respect to particular compositions listed on Schedule A.

9. The first sentence is admitted. Otherwise, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of paragraph 9.

10. Admitted that the Songwriter's Agreements covered some, but not all, of the compositions listed on Schedule A. Denied that there were no other compositions covered by the Songwriter's Agreements. Admitted that administration of the compositions on Schedule A was vested in Bridgeport. Otherwise, denied.

11. Denied that Bridgeport failed to pay any royalties or provide any accounting that it was obligated to pay or provide.

12. Denied.

13. Admitted, except without knowledge as to certain compositions.

14. Denied.

15. Denied.

16. Admitted that Bridgeport Music, Inc. and Southfield Music, Inc. have licensed and collected monies in connection with the commercial exploitation of certain compositions listed on Schedule C. Otherwise, denied.

17. The answers to paragraphs 1 through 16 are restated.

18. Denied.

19. Denied.

20. Denied.

21. The answers to paragraphs 1 through 20 are restated.

22.     Admitted that Clinton wrote part or all of a number of the compositions listed on Schedule C.  Otherwise, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegation with respect to particular compositions listed on Schedule C.

23.     Denied.

24.     Admitted that Bridgeport has been licensing and receiving monies from the commercial exploitation of the Schedule C compositions from approximately 1984 to the present, except that prior to 1989, there was no revenue and no net income.  Denied that such conduct has been without the consent of Plaintiffs.  Admitted that Bridgeport Music, Inc. and Southfield Music, Inc. registered Schedule C compositions for copyright in their names, but denied that such registration was in violation of Plaintiff's ownership.

25.     Denied.

26.     The answers to paragraphs 1 through 25 are restated.

27.     Admitted that Bridgeport Music, Inc. has claimed copyright ownership and collected revenue generated by the commercial exploitation of certain of the Schedule C compositions.  Otherwise, denied.

28.     Denied.

29.     Denied.

30.     The answers to paragraphs 1 through 29 are restated.

31.     The first sentence of paragraph 31 is admitted.  Otherwise, denied.

32.    Denied.

33.    Denied.

### FIRST AFFIRMATIVE DEFENSE
### (to Counts I and IV of Complaint)

Plaintiff Clinton materially breached his contractual obligations to Bridgeport.  Said material breaches excuse Defendant's obligations under the Songwriter Agreements referenced in Plaintiffs' complaint.

### SECOND AFFIRMATIVE DEFENSE
### (to Counts I and IV of Complaint)

Plaintiffs have failed to perform conditions precedent and/or subsequent to Bridgeport's obligations under the Songwriter Agreements and other agreements.

### THIRD AFFIRMATIVE DEFENSE
### (to Counts I and IV of Complaint)

Plaintiff's claims are barred by their failure to provide consideration.

### FOURTH AFFIRMATIVE DEFENSE
### (to Counts I through IV of Complaint)

Plaintiff's claims are barred by the doctrines of waiver and/or estoppel and/or merger.

### FIFTH AFFIRMATIVE DEFENSE
### (to Counts I through IV of Complaint)

Plaintiff's complaint is barred by res judicata.

## SIXTH AFFIRMATIVE DEFENSE
### (to Counts I through IV of Complaint)

Plaintiff's claims are barred by judicial estoppel.

## SEVENTH AFFIRMATIVE DEFENSE
### (to Counts I through IV of Complaint)

Plaintiff's claims are barred by the statute of limitations.

## EIGHTH AFFIRMATIVE DEFENSE
### (as to all Counts of Complaint

Plaintiffs are indebted to defendants or have damaged plaintiffs as particularly described in the Counterclaim filed herewith. Any judgments in favor of defendants/counterclaimants for such amounts should be set off against any judgments which may be entered in favor of plaintiffs on their Complaint.

## COUNTERCLAIM

Counterclaimants Bridgeport Music, Inc., Armen Boladian, Southfield Music, Inc., and Nine Records, Inc., file this Counterclaim against George Clinton, individually and doing business as Poop Productions, Inc., Malbiz Music, Inc., and Goosehock Music, Inc., and Stephanie Clinton, individually and doing business as Poop Productions, Inc., Malbiz Music, Inc., and Goosehock Music, Inc. and state:

## JURISDICTION

1.      The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that all Plaintiffs are citizens of different states than all Defendants and the amount in

controversy exceeds the sum of $75,000. In addition, the court has jurisdiction pursuant to 17 U.SC. § 101 and 28 U.S.C § 1338 over count II alleging copyright infringement.

## THE PARTIES

2.     Counterclaimant Bridgeport Music, Inc. ("Bridgeport") is a corporation duly organized and existing under the laws of the State of Michigan and having its principal place of business in Southfield, Michigan.     At all relevant times, Counterclaimant was and is engaged in, among other things, the business of publishing and otherwise commercially exploiting musical compositions.

3.     Counterclaimant Southfield Music, Inc. ("Southfield") is a corporation duly organized and existing under the laws of the State of Michigan and having its principal place of business in Southfield, Michigan.     At all relevant times, Counterclaimant was and is engaged in, among other things, the business of publishing and otherwise commercially exploiting musical compositions.     (Bridgeport and Southfield are collectively referred to as "Bridgeport."

4.     Counterclaimant Nine Records, Inc. ("Nine Records") is a corporation duly organized and existing under the laws of the State of Michigan and having its principal place of business in Southfield, Michigan.     At all relevant times, Counterclaimant was and is engaged in, among other things, the record production business and otherwise commercially exploiting musical compositions. Bridgeport and Southfield are Nine Records' music publishing affiliates, and are registered with

Broadcast Music, Inc. (BMI) and The American Society of Composers and Performers (ASCAP), respectively.

5. Counterclaimant Armen Boladian ("Boladian") is an individual who resides in the State of Michigan. Boladian is the sole shareholder and President of Bridgeport Music, Inc.

6. Counter-Defendant George Clinton ("Clinton") is and individual who claims residence in the State of Florida and who was and continues to be in the business of writing and performing musical works.

7. The Dog In Me, Inc. and What Production Company, Inc. are Florida corporations.

## COUNT I
## DEFAMATION

8. Counterclaimants restate the allegations set forth in paragraphs 1 through 7.

9. On September 2, 1999, Clinton made defamatory statements about Boladian on a nationwide cable television program. In particular, on a program called "Legends" aired on cable station VH-1, Clinton personally appeared and stated, referring to Boladian, "It came out in court that he had forged my name." The statement was in the context of an interview in which Clinton participated in the representation that Boladian had tortiously taken money belonging to Clinton by forging Clinton's name on legal documents without Clinton's authorization.

10. Clinton knew at the time of the aforesaid statement and representations, that Boladian had not forged Clinton's name as stated or taken money belonging to Clinton as represented.

11. The remarks by Clinton about Boladian are injurious to Boladian and bring Boladian into disrepute, and constitute defamation *per se*. Further, the remarks impeached Boladian's integrity, virtue and reputation, and is likely to lower Boladian's reputation in the estimation of others in the music industry. The remarks by Clinton will also deter others, including those with business relationships with Boladian, from doing business with Boladian.

12. As a result of the aforesaid false statements by Clinton, Boladian has suffered damages in an amount in excess of $100,000.

**WHEREFORE**, Counterclaimant Boladian demands judgment for damages against Clinton.

## COUNT II
## COPYRIGHT INFRINGEMENT

13. Counterclaimants restate the allegations set forth in paragraphs 1 through 7.

14. Bridgeport, is the registered copyright owner or the owner by assignment of the copyrights to the sound recordings and publishing rights to certain musical compositions written in whole or in part by Clinton. These compositions are copyrightable subject matter under the laws of the United States.

9

15.     Clinton has claimed and exercised ownership interests in compositions in which Bridgeport owns the copyright and majority interest and in which such counter-Defendants own no copyright or interest.  In particular, such counter-Defendants have entered into agreements purporting to release third parties from claims of copyright infringement which claims belong to Bridgeport, and such counter-Defendants have entered into agreements purporting to grant third parties rights in such compositions. Such compositions have included, but on information and belief, have not been limited to, "(Not Just) Knee Deep" and "She's Comin Out Swingin."

16.     The aforesaid conduct constitutes willful infringement upon Bridgeport's copyright.

17.     As a result of the aforesaid infringement, Plaintiffs have suffered damages in an amount in excess of $100,000.

**WHEREFORE**, Counterclaimant Bridgeport seeks judgment:

(1)     preliminarily and permanently enjoining Clinton, his agents and attorneys and from infringing upon said copyrights of counterclaimants Bridgeport and Southfield in any manner, and from publishing, selling, marketing or otherwise disposing of any copies of the phonorecord or any other devices upon which the compositions are embodied;

(2)     ordering Clinton to account for all gains, profits, and advantages derived by him or any corporations owned or controlled by him from their infringement of counterclaimants' copyrights;

(3)   awarding counterclaimants compensatory damages in an amount sufficient to compensate them for damages suffered as a result of such infringement, but not less than the minimum to which they are entitled as a matter of law;

(4)   awarding counterclaimants statutory damages pursuant to 17 U.S.C., § 504 (c) (2); and

(5)   awarding counterclaimants the costs of this action, prejudgment interest, and reasonable attorneys' fees pursuant to 17 U.S.C. § 505.

## COUNT III
## SLANDER OF TITLE

18.     Counterclaimants restate the allegations set forth in paragraphs 1 through 16.

19.     Counterclaimant Bridgeport owns the majority interest in certain compositions including, but not limited to, "Everybody Get Funked Up," "Flat Man and Bobbin," and "Underground Angel."   Counter-Defendants have no ownership interest in such compositions.   Nevertheless, such Defendants have knowingly, falsely and maliciously claimed title to such compositions and denied that Bridgeport possesses any ownership interest. These claims were published both orally and in writing by such counter-Defendants.

20.     As a proximate result of the aforesaid conduct by counter-Defendants, Bridgeport has suffered damages in excess of $100,000.

11

**WHEREFORE**, Counterclaimant Bridgeport demands judgment for compensatory and punitive damages, costs and attorney fees.

## COUNT IV
## BREACH OF LOAN AGREEMENT

21.     Counterclaimants restate the allegations of paragraphs 1 through 7.

22.     In or about July, 1990 Clinton entered into an a loan agreement with Boladian and Archie Ivy. The terms of the agreement were memorialized in written agreements dated July 5, 1990 and July 31, 1990 (collectively, "the Loan Agreement"). A copy of the Loan Agreement is attached hereto as Exhibit A.

23.     Under the Loan Agreement, Boladian loaned Clinton and Ivy $123,152. Pursuant to paragraph 5 of the Loan Agreement, if Boladian declined to exercise his option to acquire the exclusive worldwide license to market an album comprised of songs by Clinton, Clinton and Ivy were obligated to repay the Loan, with accrued interest at 10% per annum, within 45 days. Boladian declined to exercise his option to acquire the exclusive worldwide license for this particular album by a letter a copy of which is attached hereto as Exhibit B.

24.     Neither Clinton nor Ivy repaid any portion of the aforesaid loan to Boladian. Clinton materially breached the Loan Agreement by failing to pay the money owed to Boladian.

**WHEREFORE**, Counterclaimant Boladian prays for entry of judgment against counter-Defendant George Clinton in an amount to be determined at a trial of this action.

### COUNT V FRAUD
### (In connection with Loan Agreement)

25.     Counterclaimants restate the allegations of paragraphs 1 through 23.

26.     As security for the loan, Clinton pledged as collateral four master tapes he recorded for Warner Brothers, performing under the band name "Funkadelic" entitled "One Nation Under A Groove," "Uncle Jam Wants You," "Hardcore Jollies," and "Electric Spanking of War Babies." In connection with such pledge of collateral, Clinton represented that he owned said master tapes and the sound recording copyrights thereon.

27.     Said representation was false and Clinton knew it was false. Said representation was made with intent to deceive Boladian into loaning Clinton $123,152. 28.     Bol false representation was willful and malicious and counterclaimants are entitled to punitive damages in the amount of three times actual damages.

**WHEREFORE**, Counterclaimant Boladian demands judgment against Clinton in an amount in excess of $200,000 in compensatory damages plus punitive damages.

### COUNT VI
### BREACH OF CONTRACT
### (August 31, 1971 Agreement)

29.     Counterclaimants restate their allegations under paragraphs 1 through 27.

30. On or about August 31, 1971, Clinton and Malbiz Music, Inc., a corporation controlled by Clinton, entered into a Letter Agreement with Bridgeport, a copy of which is attached hereto as Exhibit C.

31. Pursuant to the aforesaid agreement, Clinton and Malbiz agreed that Bridgeport would control the issuance of all licenses for the mechanical reproduction, synchronization and publication of Clinton's musical compositions throughout the world, and that Bridgeport would be entitled to collect all compensation payable to Clinton or Malbiz with respect to such licenses.

32. Clinton breached the aforesaid agreement by signing contracts with and writing songs for third parties during the term of the agreement.

33. Bridgeport suffered damages as a proximate result of said breaches.

34. Bridgeport fully performed its obligations under the aforesaid contract.

**WHEREFORE**, Counterclaimant Bridgeport demands judgment against Clinton for damages, costs and attorney fees.

## COUNT VII
## BREACH OF CONTRACT
### (December 2, 1983 Agreement)

35. Counterclaimants restate the allegations of paragraphs 1 through 29.

36. On or about December2, 1983, Bridgeport entered into a Songwriter's Agreement, a copy of which is attached hereto as Exhibit D.

37. Pursuant to the aforesaid agreement, Clinton agreed to render his services, including the creation of musical compositions, exclusively for Bridgeport

during the term of the agreement. Also pursuant to the agreement, Clinton assigned to Bridgeport all rights and interests in the results and proceeds of Clinton's services including, but not limited to, the titles, words and music of any original musical compositions, and in all licenses and copyrights related to such compositions.

38. Clinton breached the aforesaid agreement by creating musical compositions for entities other than Bridgeport, and by taking action inconsistent with the ownership interests which he had assigned to Bridgeport. In particular, Clinton purported to sell, assign or license interests to third parties in compositions that he had assigned to Bridgeport.

39. Bridgeport fully performed it obligations under the aforesaid agreement.

40. Bridgeport has suffered damages in excess of $75,000 as a proximate result of the aforesaid breaches.

**WHEREFORE,** Counterclaimant Bridgeport demands judgement for damages, costs and attorney fees.

### COUNT VIII
### BREACH OF CONTRACT
### (April 4, 1985 Agreement)

41. Counterclaimants restate their allegations under paragraphs 1 through 7.

42. On April 4, 1985, Clinton and Bridgeport Music, Inc. entered into an Exclusive Songwriter's Agreement. A copy of the Agreement is attached hereto as Exhibit E.

43. Pursuant to said agreement, Clinton agreed to render his exclusive services in the writing and composing of original music compositions, numbers and works to Bridgeport for a period of five years, and two option years which automatically became effective if not terminated by Bridgeport. The Agreement further provided that all of the compositions created by Clinton, alone or in collaboration with others, during the term of the Agreement shall be the sole property of Bridgeport.

44. During the five year term of the Exclusive Songwriter's Agreement, Clinton rendered writing and composing services to entities other than Bridgeport. By rendering these services to entities other than Bridgeport, Clinton materially breached the Exclusive Songwriter's Agreement.

45. The aforesaid Exclusive Songwriter's Agreement required Clinton to deliver to Bridgeport not less than twelve completed compositions of marketable quality during each year for the term of the Agreement.

46. Clinton failed to provide twelve completed compositions of marketable quality during each year for the term of the Agreement. Such failure constitutes a material breach of the Exclusive Songwriter's Agreement.

47. Bridgeport has performed all of its obligations under the Exclusive Songwriter's Agreement.

48. As a proximate result of the aforesaid breaches of the Exclusive Songwriter's

Agreement by Clinton, Bridgeport has suffered damages in excess of $100,000.

**WHEREFORE,** Bridgeport demands judgment for damages, costs and attorney fees.

## COUNT IX
## TORTIOUS INTERFERENCE

49.     Counterclaimants restate their allegations under paragraphs 1 through 7.

50.     On April 4, 1985, Nine Records, Inc., Clinton, and Egmitt, Inc. entered into an Exclusive Executive Production Agreement (the "Production Agreement"). A copy of the Production Agreement is attached hereto Exhibit F.

51.     Armen Boladian is the president and sole shareholder of Nine Records, Inc. Egmitt, Inc. was a corporation that was under the control of George Clinton.

52.     Pursuant to the Production Agreement, Clinton and Egmitt agreed not to engage the services of any executive producer other than Nine Records.

53.     During the term of the Production Agreement, Clinton caused Egmitt to breach the Production Agreement by engaging the services of executive producers other than Nine Records.

54.     Under the Production Agreement, Clinton and Egmitt also agreed not to render recording services for any purpose except upon the written consent of Nine Records. During the term of the Production Agreement, Clinton did render recording services without the consent of Nine Records.

55.     This aforesaid conduct by Egmitt constituted a material breach of the Production Agreement and the conduct of Clinton in causing such breach constitutes Tortious interference with such contract.

56. The aforesaid acts of Clinton were done maliciously and with willful and wanton indifference to the rights of Nine Records under the Production Agreement.

57. As a direct result of the aforesaid Tortious interference by Clinton, Nine Records, Inc. has been damaged in an amount which cannot yet be reasonably ascertained but is in excess of $100,000.

**WHEREFORE**, Counterclaimant Nine Records, Inc. demands judgment for compensatory and punitive damages, costs and attorney fees.

## COUNT X
## DECLARATORY JUDGMENT

58. Counterclaimants restate the allegations of paragraphs 1 through 54.

59. Clinton has expressly or by implication claimed controlling ownership rights in all of the compositions referenced in Plaintiffs' Complaint listed on the attached Exhibits A and C to the Complaint. Bridgeport is the controlling owner of such compositions and Clinton has no rights of ownership or control in such compositions.

60. An actual controversy exists between Bridgeport and Clinton regarding the rights of ownership and control of such compositions.

61. Bridgeport has suffered damages and will continue to suffer such damages in the future in the absence of a judicial declaration of the rights of the parties with respect to the ownership and control of such compositions.

**WHEREFORE**, counterclaimants seek a declaratory judgment that Bridgeport is the owner of all of the compositions referenced in Plaintiffs' complaint and those compositions listed on the attached Exhibits A and C. Counterclaimants also seek a declaratory judgment that neither Clinton nor Malbiz own any portion of any of the compositions referenced in Plaintiffs' complaint or the compositions listed Exhibits A and B attached to the Complaint.

**COUNT XI**
**CORPORATE VEIL**
**(Scoop of Poop)**

62.     Counterclaimants restate their allegations under paragraphs 1 through 7.

63.     On November 18, 1997, Boladian was awarded judgment against Clinton in the amount of $1,193,500 in the Circuit Court for the County of Lenawee, State of Michigan (the "Michigan Judgment"). A copy of the Michigan Judgment is attached hereto as Exhibit G.

64.     Boladian subsequently recorded the Michigan Judgment in the State of New York.

65.     Boladian garnished certain funds held by third-party garnishee Broadcast Music, Inc. that were owed from BMI to Clinton. Subsequent to this initial garnishment, Clinton assigned his rights to the royalties he receives from BMI to Scoop of Poop Productions, Inc. ("Scoop"). BMI now refuses to pay Clinton's royalties to Boladian since it contends the royalties are now owed to Scoop rather than Clinton.

66.     Scoop is a corporation that was automatically dissolved on July 15, 1998 and is no longer active.

67.     The last registered agent of Scoop was Clinton's wife, Stephanie Clinton.

68.     Scoop was, at all relevant times, a sham corporation that was the alter ego of its shareholders and directors, George Clinton and Stephanie Clinton. At all relevant times, Clinton completely dominated Scoop and used it for his sole personal benefit, including defrauding his personal creditors and evading personal obligations.

69.     Clinton's assignment to Scoop was meant to avoid satisfying the Michigan Judgment and constitutes a fraudulent conveyance.

WHEREAS, counterclaimants pray for a decree ordering that the corporate veil of Scoop of Poop, Inc. be pierced and that all assets of said corporation be held to be assets of Clinton personally, subject to appropriate legal process in execution of any judgment against Clinton held or hereafter acquired by counterclaimants.

### COUNT XII
### CORPORATE VEIL
**(The Dog In Me, Inc. and What Production Company, Inc.)**

70.     Counter-defendants restate the allegations of paragraphs 1 through 7.

71.     The Dog in Me, Inc. and What Production Company, Inc. are Florida corporations. Both companies are and were, at all relevant times, sham corporations that were the alter ego of George Clinton. At all relevant times, Clinton completely dominated both corporations and used them for his sole personal benefit, including

defrauding his personal creditors and evading personal obligations and, in particular, frustrating Boladian's collection efforts on the Michigan Judgment.

WHEREAS, counterclaimants pray for a decree ordering that the corporate veil of Scoop of Poop, Inc. be pierced and that all assets of said corporation be held to be assets of Clinton personally, subject to appropriate legal process in execution of any judgment against Clinton held or hereafter acquired by counterclaimants..

**GREENBERG, TRAURIG**
Edward C. Wallace
Barry Richard
101 East College Avenue
Tallahassee, Florida 32301
(850) 222-6891

By:_____
**BARRY RICHARD**
Fla. Bar No. 105599

**Of Counsel:**

Joseph P. Della Maria, Esq.
Robin Korman Powers, Esq.
John D. Silk, Esq.
**ROTHSCHILD, BARRY & MYERS**
55 West Monroe Street, Suite 3900
Chicago, Illinois 60603
(312) 372-2345

**Of Counsel:**

Joseph P. Della Maria, Esq.
Robin Korman Powers, Esq.
John D. Silk, Esq.
**ROTHSCHILD, BARRY & MYERS**
55 West Monroe Street, Suite 3900
Chicago, Illinois 60603
(312) 372-2345

## CERTIFICATE OF SERVICE

I certify that the foregoing memorandum was served upon David W. Adams, 400 North

Tampa Street, Suite 2300, Tampa, Florida 33602, and Donald K. Wilson, Jr., 4929 Wilshire

Blvd., Suite 1010, Los Angeles, California 90010, this ___1st___ day of March, 2000.

_____
Barry Richard

TALL/RICHARDB/132314/2%3#01! DOC/2/29/00/99999 645006

2



DEPOSITION
EXHIBIT

EXHIBIT # 436

DATE 9-22-95 REP LAS

## AGREEMENT

AGREEMENT made this 5th day of July, 1990, by and between GEORGE CLINTON (hereinafter referred to as "Clinton"), ARCHIE IVY (hereinafter referred to as "Ivy") and ARMEN BOLADIAN (hereinafter referred to as "Boladian") as agents for and on behalf of various entities which they own and/or represent.

THE PARTIES HERETO AGREE AS FOLLOWS:

1. Boladian agrees to loan Clinton and Ivy funds for business purposes to wit: touring Europe and Japan to perform with their group at various clubs and to promote their recordings. Boladian shall immediately loan the Sum of Seventy-Three Thousand, One Hundred and Fifty-Two ( $73,152.00) Dollars ( hereinafter referred to as "Loan"). Clinton and Ivy acknowledge previously receiving Eight Thousand One Hundred and Fifty-Two ( $8,152.00) Dollars of said loan [ see Exhibit A ]. The remaining Sixty-Five Thousand ($65,000.00) Dollars shall be paid by Boladian to Clinton and Ivy by issuing a check payable to "MUNRO and MUNRO, PC Client Trust Account". Ivy and Clinton promise to pay to the order of Boladian the Loan plus interest accrued at the rate of ten (10%) per cent per annum on the outstanding principal.

2. Clinton and Ivy on behalf of themselves and their various entities irrevocably and unconditionally grant to Boladian the option to acquire for a five (5) year period the exclusive worldwide license to market an album from songs by Clinton and his group to be performed and recorded during July, 1990 at a European concert commonly known the "Montreaux Jazz Festival".

3.   Within thirty (30) days after Clinton's performance at Montreaux, Clinton and Ivy shall arrange for the delivery of the Master recording free and clear of any claims to Boladian along with the following:

a.   All required clearances

b.   proof of payment of any union fees

c.   proof that all musicians appearing on the recording have been paid

d.   any other document or receipt that Boladian might require so long as it is commercially reasonably under the circumstances and which is further usual and customary in the recording business

e.   within fourteen (14) days after return from japan, masters will be ready for commerical release.

4.   If Boladian exercises his option, he agrees to pay a One Hundred and Twenty-Five Thousand ( $125,000.00) Dollar advance to Ivy and Clinton.  Payment of the advance shall be made as follows:

a. Cancellation of the Loan herein plus any accrued interest.

b. Application of difference between $125,000.00 and the amount canceled in subparagraph 4.a. towards a certain debt (hereinafter "Debt") owed by Clinton to Boladian for sums advanced by Boladian since Clinton's bankruptcy.

Additionally, Boladian shall pay 15 points for all royalties including producer's, artist's, dancer's, but not including writer's.  Payment of one half (1/2) of said royalties shall be

-2-

made to Ivy and Clinton. The remainder of said royalties shall be paid to Clinton by application of the same against the Debt described in subparagraph 4.b. herein until the same is paid in full.

Points shall be computed on an album's retail sales price, less packaging and reasonable, normal and customary deductions.

5. If Boladian refuses to exercise his option herein, then upon written notice of said refusal to Andrew J. Munro, attorney for Clinton, at 3250 W. Big Beaver, Suite 529, Troy, MI 48084, Clinton and Ivy shall have forty-five (45) days to repay the Loan and accrued interest. If the Loan plus accrued interest is not repaid within said time period, the Loan shall be in default and Boladian shall be entitled to his remedies for default as contained herein plus any other remedies he might have at common law or under the Uniform Commercial Code as adopted by the State of Michigan.

6. As security for the Loan to be made by Boladian, Ivy and Clinton unconditionally and irrevocably grant to Boladian a security interest as hereafter set forth in four (4) master recordings (hereafter referred to as "Masters") which have been previously released and are commonly known as:

(i)

(ii)

(iii)

(iv)

If Clinton and/or Ivy default pursuant to paragraph 5 herein

-3-

Boladian shall be given physical possession and control of Masters. Within 30 days of default, Boladian shall publicly offer for license said Masters to persons involved in the record industry. Bids will be taken and the highest bidder shall be licensed. However, no bids shall be accepted unless they contain the following minimum economic terms and conditions:

a. An advance of not less than Two Hundred and Fifty Thousand ( $250,000.00) dollars.

b. Exclusive worldwide rights for any configuration for a period of three (5) years from date of release.

c. Subject to Warner Brother's 5% override.

d. Payment to Ivy and Clinton of 10 points for all royalties including producer's, artist's, dancer's, but not including writer's. Points shall be computed on an album's retail sales price, less packaging and reasonable, normal and customary deductions.

e. Quarterly reports of sales and expenses subject of the license.

Boladian shall pay the Loan plus accrued interest and expenses incurred in connection with the public sale from the licensing proceeds. Any remaining licensing monies shall be paid over to Ivy and Clinton without further setoff.

Boladian may purchase the license rights for himself by matching the highest bid received or if no bid is received, then by meeting the minimum terms and conditions contained in this

-4-

subparagraph. One half of any sums required to be paid by Boladian shall be considered paid to Ivy and Clinton by the application said amount against the Debt.

7.    Ivy and Clinton represent and warrant that they have the ability and right to license the Albums according to the terms and conditions in paragraph 6.

8.    All parties agree that Andrew J. Munro is acting as the attorney of George Clinton and on behalf of no other person.

9. All parties agree that in fulfilling the intent of this Agreement, other more detailed agreements will be required. Each party agrees to negotiate in good faith the terms and conditions of any additional required agreements. If a deadlock or disagreement results in implementing this Agreement or additional required agreements, all parties agree to submit the disagreement to binding arbitration before the American Arbitration Association, Southfield, Michigan.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date and year first above written.

IN THE PRESENCE OF:

_____        _____
                               GEORGE CLINTON

_____        _____
                               ARCHIE IVY

1:up\clinton\m2\loanbola.agr   _____
                               ARMEN BOLADIAN

-5-



Montreux, May 1990

## AGREEMENT AND AUTHORIZATION TO RECORD AND TO PURCHASE TAPES

1. – I herewith request Mountain Studios to record my performance at the 1990 Montreux Jazz Festival.

2. – I understand that there will be no charge for this recording.

3. – I do, however understand and agree to purchase from Mountain Studios all tapes used in recording my performance.

4. – I agree to the tape cost of :

    SFr.   300.—  per 1/4" reel (1/2 hr. 15 ips)
    SFr.   900.—  per 2" reel (1/2 hr. 15 ips)
    SFr.   900.—  per 1/2 hr. digital 2-track recording
    SFr.   900.—  per 1/2 hr. digital 24-track recording
    SFr. 1'200.—  per 1/2 hr. if both digital and analog 24-track taken
    SFr. 1'200.—  per 1/2 hr. if both digital 2-track and 24-track taken

5. – I further agree to pay the total SFr. amount for the tapes during or before the end of the Jazz Festival, to Mountain Studios, at the office, where the tapes will be waiting for collection.

6. – I agree that my tapes will be released only to me, or to the person bearing my signed authorization.

7. – Mountain Studios releases these tapes to me, or my representative, upon payment as described in no.4 & 5 above, with no further claims, or monetary interest.

8. – I further agree that Mountain Studios and its engineer, David Richards, will be included on any album credits.

9. – If a record is released, the recording company will provide Mountain Studios with 10 free samples of the record for promotional use and the Mountain Studios library.

10. – I agree that the tapes will only be used by me  for the purpose of making audio gramophone records or for my private or promotional use and not broadcast on radio or TV (other than  as a gramophone record) without the consent of the Jazz  Festival.

_____          _____
Signature / name of the Artist        Signature / Mountain Studios

Mountain Studios S.A. 8, Rue du Théâtre, P.O. Box 170, 1820 Montreux 2, Switzerland  Tel: (021) 963 56 56, Telex: 453218 MNTN CH

expressly represent, warrant and acknowledge that they have no
further interest in said name and no further rights to its use.

     **5.**   **Release of Clinton's Interest in Rubber Band.**
Clinton hereby represents, warrants, agrees and acknowledges that
he has transferred and assigned to Collins his entire interest in
Rubber Band, including all of his shares of stock therein, that he
has no interest of any kind in Rubber Band, and, without limiting
the foregoing, that he has no financial or other interest in or to
the results and proceeds of the recording, producing, and/or
songwriting services of the Troutmans, Roger Troutman, "Zapp," or
Collins, or any of them, with respect to the Zapp Masters or to
the compositions embodied thereon.

     **6.**   **Disposition of the Clinton Masters.**  (a)  Company
hereby authorizes Clinton, or his designee, to enter into an
exclusive agreement ("Distribution Agreement") with a third
party ("Third Party Distributor") relating to the manufacture,
distribution and sale of records produced from the Clinton
Masters.  Said Agreement will not be effective until Company, by
written notice, relinquishes its ownership of the Clinton Masters
pursuant to paragraph 6(f) of this Settlement Agreement.

     (b)  Upon execution of the Distribution Agreement,
Clinton shall cause the Third Party Distributor to agree directly
in writing with Company ("Override Agreement"), and for Company's

-10-

express benefit, to pay Company a royalty with respect to sales throughout the world of albums on which any Clinton Masters are embodied. Said royalty is to be at the rate of five percent (5%) (the "Base Rate"), based upon the suggested retail list price of such records, with respect to one hundred percent (100%) of such sales. Any royalty payable to Company pursuant to this paragraph 6(b) in respect of a particular record shall be reduced, computed and/or otherwise determined in the same manner as is the royalty payable to Clinton or his designee in respect of such record pursuant to the Distribution Agreement; provided, however, that the Base Rate shall not be reduced as a result of the inclusion in any such record of master recordings embodying Clinton's performances which are not Clinton Masters. All such royalties shall be payable to Company from the first record sold without regard to the recoupment by the Third Party Distributor of any monies whatsoever. The Override Agreement shall provide that the royalty payments to Company contemplated by this paragraph 6(b) shall be made until Company has received a total of $283,333.34 in such payments, at which point they shall cease.

(c) The Override Agreement shall further provide that the Third Party Distributor shall account to Company and pay Company royalties at the same time as the Third Party Distributor accounts to Clinton or his designee, but no less frequently than semi-annually, and that the Third Party Distributor shall accord

-11-

Company independent audit rights with respect to such accountings on the same basis as is applicable to audits conducted of the Third Party Distributor by Clinton or his designee pursuant to the Distribution Agreement.

(d)  Clinton hereby warrants and represents, and the Override Agreement shall provide, that Clinton or his designee and the Third Party Distributor shall be solely responsible for and shall make any and all payments required to be made in connection with the manufacture, distribution, sale or other exploitation of records embodying any of the Clinton Masters, including, without limitation, all artists' royalties (including royalties payable to Clinton or his designee), producers' royalties, mechanical or copyright fees or royalties, contributions which may become due to the AFM Music Performance Trust Fund, the AFM Special Payments Fund, or any other union trust fund, and Clinton or his designee and the Third Party Distributor shall hold Company free and harmless from any and all claims in connection therewith.

(e)  Clinton hereby warrants and represents, and the Override Agreement shall provide, that Clinton and the Third Party Distributor shall indemnify and hold Company and Company's licensees harmless from any damage, liabilities, costs and expenses, including legal expenses and attorneys' fees, arising out of (i) any and all uses of any of the Clinton Masters by

-12-

Clinton, his designee and/or the Third Party Distributor, or their respective successors, assigns or licensees, and/or (ii) any failure by Clinton, his designee or the Third Party Distributor to make any of the payments contemplated by the provisions of paragraph 6(d) of this Settlement Agreement.

(f) Upon receipt by Company of the Override Agreement, executed by the Third Party Distributor and containing the provisions specified in paragraphs 6(a), 6(b), 6(c), 6(d) and 6(e) of this Settlement Agreement, Company shall, by written notice to Robert S. Besser ("Besser"), relinquish its ownership of the Clinton Masters and its interests in the performances embodied therein. Clinton shall not be deemed to have any rights in any of the Clinton Masters until such time as Company gives such written notice. Notwithstanding anything to the contrary contained herein, Company shall have full rights to exploit the Clinton Masters pursuant to the Thang-Warner Agreement until six months after the date on which it gives such written notice, except Company shall not press any new copies of the albums currently embodying the Clinton Masters after thirty days following the date on which this Settlement Agreement has been executed by all parties hereto.

(g) After Clinton has executed this Settlement Agreement, he shall deliver to Company a trust agreement executed by Besser on behalf of the law firm of Margolis, Burrill & Besser, in the form of Exhibit B attached hereto. Upon receipt of said

-13-

trust agreement and a sum sufficient to pay the costs of the duplication provided for by this paragraph 6(g), Company shall make and deliver to Besser a duplicate set of the master tapes constituting the Clinton Masters. Said duplicate master tapes will be held in trust for Company by the law firm of Margolis, Burrill & Besser, pursuant to the terms of said trust agreement, until such time as Company shall give Besser the written notice contemplated by paragraph 6(f) of this Settlement Agreement. Upon receipt of said notice, Besser shall transfer said duplicate master tapes to Clinton. Clinton shall be responsible for all shipping and other costs incurred in connection with the delivery of said duplicate master tapes, both to Besser and to Clinton, as provided in this paragraph 6(g).

(h)  Clinton shall be solely responsible for and shall pay all sales, use or similar taxes which may be imposed by any taxing jurisdiction as a result of the transfer of the Clinton Masters to Clinton, or his designee or the relinquishment of ownership of said Masters by Company.

7.  <u>Adjustment and Recoupment of Loans by Company</u>.  (a) Company hereby forgives the loan in the amount of Ninety-Six Thousand Dollars ($96,000) made on August 30, 1979 by Company to Thang and/or Clinton.

--14--

(b) Thang and Clinton hereby reaffirm that they owe Company a balance due of Eighty-Three Thousand Three Hundred Thirty-Three Dollars and Thirty-Four Cents ($83,333.34) remaining from the loan in the amount of Five-Hundred Thousand Dollars ($500,000) made on May 3, 1979 by Company to Thang and/or Clinton. Said loan is hereby converted to a nonrecourse loan and shall be deemed repayable from the royalty payments made to Company pursuant to the Override Agreement.

(c) Clinton, Thang, and P-Funk acknowledge that they owe Company the amount of Two-Hundred Thousand Dollars ($200,000) on the Loan in that amount made on April 18, 1981 by Company to Thang, Clinton, and P-Funk. Said loan is hereby converted to a nonrecourse loan and shall be deemed repayable from the royalty payments made to Company pursuant to the Override Agreement.

8. **Dismissal of Litigation.** (a) Forthwith upon its execution of this Settlement Agreement, Rubber Band will execute and deliver to Company for filing a Stipulation and Order for Dismissal in the form of Exhibit C, attached hereto, requesting the court to dismiss with prejudice that certain lawsuit entitled Rubber Band Music, Inc. v. Lawrence Troutman, et al, No. 82 CIV 4488, now pending in the United States District Court for the Southern District of New York.

-15-

## BS 2973

COMIN' ROUND THE MOUNTAIN
SMOKEY
IF YOU GOT FUNK, YOU GOT STYLE
HARDCORE JOLLIES
SOUL MATE
COSMIC SLOP
YOU SCARED THE LOVIN' OUTTA ME
ADOLESCENT FUNK

## BSK 3209

ONE NATION UNDER A GROOVE
GROOVALLEGIANCE
WHO SAYS A FUNK BAND CAN'T PLAY ROCK?!
PROMENTALSHITBACKWASHTSYCHOSIS. ENEMA SQUAD
INTO YOU
CHOLLY (FUNK GETTING READY TO ROLL!)

Special EP

MAGGOT BRAIN
LUNCHMEATAPHOBIA (THINK! IT AIN'T ILLEGAL YET!)
P.E. SQUAD/DOO DOO CHASERS

## BSK 3371

FREAK OF THE WEEK
(not just) KNEE DEEP
UNCLE JAM
FIELD MANEUVERS
HOLLY WANTS TO GO TO CALIFORNIA
FOOT SOLDIERS (star-spangled funky)

## BSK 3482

ELECTRIC SPANKING OF WAR BABIES
ELECTRO-CUTIES
FUNK GETS STRONGER (PART 1)
BRETTINO'S BOUNCE
FUNK GETS STRONGER (killer millimeter longer version)
SHE LOVES YOU
SHOCKWAVES
OH, I
ICKA PRICK

## EXHIBIT A

DEPOSITION
EXHIBIT
EXHIBIT # 437
DATE 9-22-95 REP LHS



## AMENDED AGREEMENT

AGREEMENT made this _31_ day of July, 1990, by and between GEORGE CLINTON (hereinafter referred to as "Clinton"), ARCHIE IVY (hereinafter referred to as "Ivy") and ARMEN BOLADIAN (hereinafter referred to as "Boladian") as agents for and on behalf of various entities which they own and/or represent.

THE PARTIES HERETO AGREE AS FOLLOWS:

1. The parties hereto have made a previous agreement during July, 1990, (hereinafter referred to as Agreement) whose terms and conditions they wish to amend by this document. The parties intend to incorporate into this Amended Agreement the terms and conditions of the Agreement by reference. This Amended Agreement shall be controlling over the parties' previous Agreement. The previous Agreement is more particularly described as calling for the payment of monies by Boladian to Clinton and Ivy. Said monies constitute either a record advance or loan depending upon whether Boladian exercises a recording contract option for Clinton's Montreaux Jazz Festival performance, July of 1990.

2. Boladian agrees to advance an additional Fifty Thousand ($50,000.00) Dollars to or for the benefit of Clinton and Ivy. The parties hereto agree to modify the Agreement by changing paragraph 1. of the Agreement to include this additional amount by increasing the loan amount from $73,152.00 to $123,152.00. Further, the parties agree to amend paragraph 4. of the Agreement as follows:

" 4. If Boladian exercises his option, he agrees to pay a

One Hundred and Twenty-Three Thousand, One Hunderd and Fifty-Two ( $123,152.00) Dollar advance to Ivy and Clinton. Payment of the advance shall be made as follows:

a. Cancellation of the Loan herein plus any accrued interest.

b. Application of difference between $123,152.00 and the amount canceled in subparagraph 4.a. towards a certain debt (hereinafter "Debt") owed by Clinton to Boladian for sums advanced by Boladian since Clinton's bankruptcy.

Additionally, Boladian shall pay 15 points for all royalties including producer's, artist's, dancer's, but not including writer's. Payment of one half (1/2) of said royalties shall be made to Ivy and Clinton. The remainder of said royalties shall be paid to Clinton by application of the same against the Debt described in subparagraph 4.b. herein until the same is paid in full.

Points shall be computed on an album's retail sales price, less packaging and reasonable, normal and customary deductions."

3. In all other respects the Agreement shall remain unchanged and in full force and effect.

4. All parties agree that Andrew J. Munro is acting as the attorney of George Clinton and on behalf of no other person.

5. All parties agree that in fulfilling the intent of this

-2-

Agreement, other more detailed agreements will be required. Each party agrees to negotiate in good faith the terms and conditions of any additional required agreements. If a deadlock or disagreement results in implementing this Agreement or additional required agreements, all parties agree to submit the disagreement to binding arbitration before the American Arbitration Association, Southfield, Michigan.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date and year first above written.

IN THE PRESENCE OF:

_____          _____
                                          GEORGE CLINTON

_____          _____
                                          ARCHIE IVY

1\rs\clinton\af\amendlean.agr            _____
                                          ARMEN BOLADIAN

-3-

## EXHIBIT A

Lease commonly known as: Delassus #1

(Legal Description)

The South Quarter (S 1/4) of the Southeast Quarter (SE 1/4) of Section 34, Township 8 North, Range 3, East, of the Third Principal Meridian, Fayette County, Illinois containing eighty (80) acres more or less.

(Lease Description)

| NO. | DATE | LESSOR | BOOK | PAGE |
|-----|------|--------|------|------|
| 1. | 08-04-76 | John W. Delassus and Jessie Lorraine Delassus, Husband and Wife | 620 | 34 |

November 28, 1990

Mr. Andy Munro
Munro & Munro
Attorneys & Counselors
3250 West Big Beaver Rd.
Suite 529
Troy, MI. 48084

RE: Security Agreement Dated 5th July, 1990

Dear Andy:

I have listened to the Montreaux tapes you had on
cassette tapes, that was recorded while George & the group
were in Europe. These tapes have to be mixed, as they are
not ready for release the way they are. I have done some
checking with the studios around town, special tape recorders
will have to be rented and the cost is about $700.00 per hour.
At this time, I am going to pass on this Montreaux recording
project.

Would you please arrange with your client to make
immediate payment of the money loaned, and any interest that
may accrue at the rate of ten (10%). If such loan is not
repaid, then the four (4) previously released Warner Bros.
albums by Funkadelic, as in paragraph 6 of the July 5, 1990
agreement (see Exhibit A), at that timethealbumsliated in
(Exhibit A) should be in our possesion, according to the
agreement.

In any event, I do need the money replaced. Andy, you
know how hard it is to get money from George, so please
expedite this as soon as possible.

Thanks for your early response.

Sincerely,

Armen Boladian

AB/hah

AQ    08

c

Dated: August 31, 1971

Bridgeport Music, Inc.
c/o Janus Record Corp.
1301 Avenue of the Americas
New York, New York 10019

Gentlemen:

The following will confirm in writing our understanding
with respect to all musical compositions heretofore written
or hereinafter written by George Clinton, alone or in colla-
boration with others, during a period of five (5) years
from the date hereof, which musical compositions are ini-
tially recorded by or on behalf of Westbound Records, Inc.
(hereinafter referred to as "the Musical Compositions"):

1.  We represent and warrant that we shall be the sole
owner of the copyrights throughout the world in and to
the Musical Compositions; that the Musical Compositions
shall be original and shall not infringe upon any other
copyrighted work; that we have the full right, power and
authority to enter into this agreement; and that we have
not heretofore and shall not hereinafter sell, assign or
encumber any right or interest in the Musical Compositions.

2.  We hereby assign to you an undivided one-half (1/2)
interest in all our rights (including the copyrights
throughout the world) in and to the Musical Compositions.

3.  Subject to the terms and conditions of this agreement,
either of us may sell, assign or encumber our respective
undivided one-half (1/2) interest in and to the copyrights
in the Musical Compositions without first obtaining the
written permission of the other, but neither of us may sell,
assign or encumber the interest of the other.

4.  You will issue or control the issuance of all licenses
for the mechanical reproduction, synchronization and pub-
lication of the Musical Compositions throughout the world,
and for the sub-publication of the Musical Compositions
throughout the world, and you shall be entitled to collect
(and authorize others to collect) all compensation pay-
able to you and us with respect to such licenses.

5.  After deduction of writer royalties, you shall pay
to us Fifty Percent (50%) of all income received by you
in connection with the Musical Compositions, less only:

        (a)  one-half (1/2) of the collection or other
fees charged by a collection agent who renders services
with respect to the Musical Compositions (provided that such
charges shall not be in excess of those customarily imposed
on music publishers throughout the industry); and

        (b)  one-half (1/2) of the actual costs and expenses
of printing, arranging, editing, exploiting and selling
printed editions of the Musical Compositions, including but

not limited to sales agency expenses, as well as one-half (1/2) of the actual costs and expenses incurred in the promotion of phonograph records embodying the Musical Compositions.

6. Public performance rights in the Musical Compositions have been or shall be assigned to and licensed by BMI which society shall be authorized to collect all monies earned from public performances of the Musical Compositions and to pay directly to each of us one-half (1/2) of the share which it customarily allocates to each of us pursuant to our respective agreements with it. You shall immediately upon the signing hereof notify such society of such authorization.

7. Except insofar as the foregoing representations and warranties are concerned, and except with respect to claims brought by or on behalf of the writer(s) of the Musical Compositions (for which we assume sole responsibility), you and we agree to assume joint liability for the defense and satisfaction of any claim brought by third persons with respect to the copyrights in the Musical Compositions or any rights derived therefrom.

8. All sums payable to us by you pursuant to the terms of this agreement shall be accounted for in writing, and paid at the time of accounting, at the same times as you customarily account to authors and composers, but in no event less than twice a year.

9. The term of this agreement for the Musical Compositions co-published hereunder shall be for the copyright term of the Musical Compositions and any renewal (or extended) terms within our control anywhere in the world.

10. This agreement sets forth the entire understanding between you and us, and it shall not be varied except by written document subsequently signed by the party sought to be charged. This agreement shall be interpreted in accordance with the law of the State of New York applicable to agreements wholly to be performed therein.

If the foregoing accurately sets forth your understanding of our agreement, kindly cause this letter to be countersigned where indicated below.

Very truly yours,

MALBIZ MUSIC CO.

By: _____
George Clinton


The foregoing accurately sets forth our understanding:

BRIDGEPORT MUSIC, INC.

By: _____
Yvonne Taylor

Accepted and Agreed to:

_____
George Clinton

STATE OF NY                    )
                               )  SS.:
COUNTY OF NY                   )

On the _31_ day of _August_ , 1971 before me
personally came George Clinton, president of Malbiz Music
Co. to me known and known to me to be the individual des-
cribed in and who executed the foregoing instrument person-
ally and on behalf of Malbiz Music Co. and acknowledged
to me that he executed same.

LINDA DIGIOVANNI
Notary Public, State of New York
No. 31-4031710
Qualified in New York County
Commission Expires March 30, 1972

D

## WRITERS AGREEMENT

THIS AGREEMENT, made this ⸺ day of ⸺, 1983, by and between GEORGE CLINTON , hereinafter referred to as "Writer" and BRIDGEPORT MUSIC, INC., hereinafter referred to as "Publisher"

### W.I.T.N.E.S.S.E.T.H:

In consideration of the mutual covenants and undertakings herein set forth, the parties do hereby agree as follows:

1. Publisher hereby engages Writer to render his services as a songwriter and composer and otherwise as may be hereinafter set forth. Writer hereby accepts such engagement and agrees to render such services exclusively for Publisher during the term hereof, upon the terms and conditions set forth herein.

2. The term of this Agreement shall commence with the date hereof and shall continue in force for a period of five (5) years from said date. Writer hereby grants to Publisher a series of two (2) separate, consecutive and irrevocable options of one (1) year, each beginning at the expiration of the original term hereof, upon all of the same terms and conditions as are applicable to the original term. Each option shall be deemed to be exercised by Publisher unless it shall give Writer written notice to the contrary at least thirty (30) days prior to the expiration of the then current term. Whenever the expressions "the term of this Agreement" or "period hereof" or words of similar connotation are included herein, they shall be deemed to mean and refer to the original period of this Agreement and the periods of all renewals extensions, substitutions or replacements of this Agreement, whether expressly indicated or otherwise.

3. (a) Writer herby irrevocably and absolutely assigns, transfer, sets over and grants to Publisher, its successors and assigns each and every and all rights and interests of every kind, nature and description in and to the results and proceeds of Writer's services hereunder, including but not limited to the titles, words and music of any and all original musical compositions in the public domain in any and all forms, and all rights and interests existing under all agreements and licenses relating thereto, together with all world-wide copyrights and extensions thereof, which musical works have been written, composed, created or conceived, in whole or in part, by Writer.



DEPOSITION EXHIBIT
Clinton 252
1-30-95 KC

alone or in collaboration with another or others, and which may hereafter, during the term hereof, be written, composed, created or conceived by Writer, in whole or in part, alone or in collaboration with another or others, and which are now owned or controlled and which may, during the term hereof, be acquired owned or controlled, directly or indirectly, by Writer, alone or with others, or as the employer or transferee, directly or indirectly, of the writers or composers thereof, including the title, words and music of each such composition, and all world-wide copyrights and renewals and extensions thereof, all of which Writer does hereby represent are and shall at all times be Publisher's sole and exclusive property as the sole owner thereof, free from any adverse claims or rights therein by any other person, firm or corporation.

(b) Writer acknowledges that, included within the rights and interests hereinabove referred to, but without limiting the generality of the foregoing, is Writer's irrevocable grant to Publisher, its successors, licensees, sublicensees and assigns, of the sole and exclusive right, license, privilege and authority throughout the entire world with respect to the said original musical compositions and original arrangements of compositions in the public domain, whether now in existence or hereafter created during the term hereof, as follows:

(i) To perform said musical compositions publicly for profit by means of public and private performance, radio broadcasting, television, or any and all other means, whether now known or which may hereafter come into existence.

(ii) To substitute a new title or titles for said compositions and to make any arrangement, adaptation, translation, dramatization and transposition of said compositions, in whole or in part, and in connection with any other musical, literary or dramatic material as Publisher may deem expedient or desirable.

(iii) To secure copyright registration and protection of said compositions in Publisher's name or otherwise as Publisher may desire at Publisher's own cost and expense and at Publisher's election, including any and all renewals and extensions of copyrights, and to have and to hold said copyrights, renewals, extensions and all rights of whatsoever nature thereunder existing, for and during the full term of all said copyrights and all renewals and extensions thereof.

(iv)  To make or cause to be made, master records, transcriptions, sound tracks, pressings, and any other mechanical, electrical or other reproductions of said compositions, in whole or in part, in such form or manner and as frequently as Publisher's sole and uncontrolled discretion shall determine, including the right to synchronize the same with sound motion pictures and the right to manufacture, advertise, license or sell such reproductions for any and all purposes, including but not limited to private performances and public performances, by broadcasting, television, sound motion pictures, wired radio and any and all other means or devices whether now known or which may hereafter come into existence.

(v)  To print, publish and sell sheet music, orchestrations, arrangements and other editions of the said compositions in all forms, including the right to include any or all of said compositions in song folios or lyric magazines with or without music, and the right to license others to include any or all of said compositions in song folios or lyric magazines with or without music.

(vi)  Any and all other rights of every and any nature now or hereafter existing under and by virtue of any common law rights and any copyrights and renewals and extensions thereof in any and all of such compositions.

(c)  Writer grants to Publisher, without any compensation other than as specified herein, the perpetual right to use and publish and to permit others to use and publish Writer's name (including any professional name heretofore or hereafter adopted by Writer), likeness, voice and sound effects and biographical material, or any reproduction or simulation thereof and titles of all compositions hereunder in connection with the printing, sale, advertising, distribution and exploitation of music, folios, recordings, performances, player rolls and otherwise concerning any of the compositions hereunder, and for any other purpose related to the compositions hereunder, and for any other purpose related to the business of Publisher, its affiliated and related companies, or to refrain therefrom.  This right shall be exclusive during the term hereof and nonexclusive thereafter. Writer will not authorize or permit the use of his name, likeness, biographical material concerning Writer, or other identification of Writer, or any reproduction or simulation thereof, for or in connection with any musical composition or works, in any manner or for any purpose, other than by

- 3 -

AO    98

or for Publisher. Writer further grants to Publisher the right to refer to Writer as a "Publisher Exclusive Songwriter and Composer" or other similar appropriate appellation.

4. From the date hereof and during the term of this Agreement, Writer will not write or compose, or furnish or dispose of, any musical compositions, titles, lyrics or music, or any rights or interests therein whatsoever, nor participate in any manner with regard to the same for any person, firm or corporation other than Publisher, nor permit the use of his name or likeness as the writer or co-writer of any musical composition by any person, firm or corporation other than Publisher.

5. Writer hereby warrants and represents to Publisher that:

(a) Writer has the full right, power and authority to enter into and perform this Agreement and to grant to and vest in Publisher all the rights herein set forth, free and clear of any and all claims, rights and obligations whatsoever;

(b) All the results and proceeds of the services of Writer hereunder, including all of the titles, lyrics, music and musical compositions, and each and every part thereof, delivered and to be delivered by Writer hereunder are and shall be new and original and capable of copyright protection throughout the entire world;

(c) No part thereof shall be an imitation or copy of, or shall infringe any other original material; and

(d) Writer has not and will not sell, assign, lease, license or in any other way dispose of or encumber the rights herein granted to Publisher.

6. Writer does hereby irrevocably constitute, authorize, empower and appoint Publisher, or any of its officers, Writer's true and lawful attorney (with full power of substitution and delegation) in Writer's name, and in Writer's place and stead, or in Publisher's name, to take and do such action, and to make, sign, execute, acknowledge and deliver any and all instruments or documents which Publisher, from time to time, may deem desirable or necessary to vest in Publisher, its successors, assigns and licensees, any of the rights or interests granted by Writer hereunder, including but not limited to such documents required to secure to Publisher the renewals and extensions of copyrights throughout the world of musical compositions written or composed by Writer and owned by Publisher, and also such documents necessary to assign to Publisher, its successors and assigns, such renewal copyrights, and all rights therein for the terms of such renewals and extensions for the use and benefit of Publisher, its successors and assigns.

- 4 -

7.    Provided that Writer shall faithfully and completely perform the terms, covenants and conditions of this Agreement, Publisher hereby agrees to pay Writer for the services to be rendered by Writer under this Agreement and for the rights acquired and to be acquired hereunder, the following compensation based on the musical compositions which are the subject hereof:

(a)   Five (5¢) cents per copy for each and every regular piano copy and for each and every dance orchestration sold by Publisher and paid for, after deduction of each and every return, in the United States.

(b)   Ten (10%) percent of the retail selling price upon each and every printed copy of each and every other arrangement and edition thereof printed, published and sold by Publisher and paid for, after deduction of each and every return, in the United States, except that in the event that such compensation shall be used or caused to be used, in whole or in part, in conjunction with one or more other musical compositions in a folio or album, Writer shall be entitled to receive that proportion of said ten (10%) percent which the subject musical composition shall bear to the total number of musical compositions contained in such folio or album.

(c)   Fifty (50%) percent of any and all net sums actually received (less any costs for collection) by Publisher from mechanical rights, electrical transcription and reproducing rights, motion picture synchronization and television rights and all other rights (excepting public performing rights) therein, including the use thereof in song lyric folios, magazines or any other editions whatsoever sold by licensees of Publisher in the United States.

(d)   Writer shall receive his public performance royalties throughout the world directly from his own affiliated performing rights society and shall have no claim whatsoever against Publisher for any royalties received by Publisher from any performing rights society which makes payment directly (or indirectly other than through Publisher) to writers, authors and composers.

(e)   Fifty (50%) percent of any and all net sums, after deduction of foreign taxes, actually received (less any costs for collection) by Publisher from sales and uses directly related to subject musical compositions in countries outside of the United States [other than public performance royalties as hereinabove mentioned in Paragraph 7(d)].

(f)   Publisher shall not be required to pay any royalties on professional or complimentary copies of any

AQ    100

- 5 -

copies or mechanical derivatives which are distributed gratuitously to performing artists, orchestra leaders, disc jockeys or for advertising or exploitation purposes. Furthermore, no royalties shall be payable to Writer on consigned copies unless paid for, and not until such time as an accounting therefor can properly be made.

(g) Royalties as specified hereinabove shall be payable solely to Writer in instances where Writer is the sole author of the entire composition, including the words and music thereof. If this Agreement with Publisher is made and executed by more than one person in the capacity of Writer, the royalties as hereinabove specified shall be payable solely to the particular Writer or Writers who are the authors of the entire composition, including the words and music thereof, and such royalties shall be divided equally among the particular Writers of such composition unless another division is agreed upon in writing between the Writers. However, in the event that one or more other songwriters are authors along with Writer on any composition, then the foregoing royalties shall be divided equally between Writer and the other songwriters of such composition unless another division of royalties is agreed upon in writing between the parties concerned.

(h) Except as herein expressly provided, no other royalties or moneys shall be paid to Writer.

8. Publisher will compute the royalties earned by Writer pursuant to this Agreement within ninety (90) days after the first day of January and the first day of July of each year for the preceding six (6) month period, and will remit to Writer the net amount of such royalties, if any, after deducting any and all recouped advances and chargeable costs under this Agreement, together with the detailed royalty statement, within such ninety (90) days. All royalty statements rendered by Publisher to Writer shall be binding upon Writer and not subject to any objection by Writer for any reason unless specific objection is made, in writing, stating the basis thereof, to Publisher within one (1) year from the date rendered. Writer shall have the right, upon the giving of at least thirty (30) days written notice to Publisher, to have a Certified Public Accountant inspect the books and records of Publisher, insofar as the same concerns Writer, at the expense of Writer, at reasonable times during normal buiness hours, for the purpose of verifying the accuracy of any royalty statement rendered to Writer hereunder.

9. Whenever Writer shall collaborate with any other person in the creation of any musical composition, any such musical composition shall be subject to the terms and conditions of this Agreement and Writer warrants and represents

- 6 -

that prior to the collaboration with any other person, such other person shall be advised of this exclusive agreement and that all such compositions must be published by Publisher. In the event of such collaboration with any other person, Writer shall notify Publisher of the extent that such other person may have in any such musical composition and Writer shall cause such other person to execute a separate songwriter's agreement with respect thereto, which agreement shall set forth the division of the songwriter's share of income between Writer and such other person, and Publisher shall make payment accordingly. If Publisher so desires, Publisher may request Writer to execute a separate agreement in Publisher's customary form with respect to each musical composition hereunder. Upon such request, Writer will promptly execute such agreement. Publisher shall have the right, pursuant to the terms and conditions hereof, to execute such agreement in behalf of Writer hereunder. Such agreement shall supplement and not supersede this Agreement. In the event of any conflict between the provisions of such agreement and this Agreement, the provisions of this Agreement shall govern. The failure of either of the parties hereunder, including but not limited to the rights of Publisher to all of the musical compositions written and composed by Writer.

10. Writer will deliver a manuscript copy of each musical composition hereunder immediately upon the completion or acquisition of such musical composition. Publisher shall advance reasonable costs for the production of demonstration records provided that Publisher shall have approved in writing such costs in advance, and one-half (1/2) such costs shall be deemed additional nonreturnable advances to Writer and shall be deducted from royalties payable to Writer by Publisher under this Agreement. All recordings and reproductions made at demonstration recording sessions hereunder shall become the sole and exclusive property of Publisher, free of any claims whatsoever by Wrtier or any person deriving any rights from Writer.

11. Writer acknowledges that the services rendered hereunder are of a special, unique, unusual, extraordinary and intellectual character which gives them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law, and that a breach by Wrtier of any of the provisions of this Agreement will cause Publisher great and irreparable injury and damage. Writer expressly agrees that Publisher shall be entitled to remedies of injunction and other equitable relief to prevent a breach of this Agreement or any provision hereof, which relief shall be in addition to any other remedies, for damages or otherwise, which may be available to Publisher.

12. (a) Publisher may take such action as it deems

necessary, either in Writer's name or in its own name, against
any person to protect all rights and interest acquired by Pub-
lisher hereunder. Writer will at Publisher's request, coope-
rate fully with Publisher in any controversy which may arise
or litigation which may be brought concerning Publisher's
rights and interests obtained hereunder. Publisher shall
have the right, it its absolute discretion, to employ attor-
neys and to institute or defend any action or proceeding and
to take any other proper steps to protect the right, title
and interest of Publisher in and to each musical composition
hereunder and every portion thereof and in that connection,
to settle, compromise or in any other manner dispose of any
matter, claim, action or proceeding and to satisfy any judg-
ment that may be rendered, in any manner as Publisher in its
sole discretion may determine. Any legal action brought by
Publisher against any alleged infringer of any musical compo-
sition hereunder shall be initiated and prosecuted by Pub-
lisher, and if there is any recovery made by Publisher as a
result thereof, after deduction of the expense of litigation,
including but not limited to attorneys' fees and court costs,
a sum equal to fifty (50%) percent of such net proceeds shall
be paid to Writer.

       (b)  If a claim is presented against Publisher in
respect to any musical composition hereunder, and because
thereof Publisher is jeopardized, Publisher shall have the
right thereafter, until said claim has been finally adjudi-
cated or settled, to withhold any and all royalties that may
be or become due with respect to such disputed compositions
pending the final adjudication or settlement of such claim.
Publisher, in addition, may withhold from any and all royal-
ties or other sums that may be due and payable to Writer
hereunder, an amount which Publisher deems sufficient, to
reimburse Publisher for any contemplated damages, including
court costs and attorneys' fees and costs resulting there-
from.  Upon the final adjudication or settlement of each and
every claim hereunder, all moneys withheld shall then be dis-
bursed in accordance with the final adjudication or settle-
ment of said claim.

    13.  Any written notice, statement, payment or matter
required or desired to be given to Publisher or Writer pur-
suant to this Agreement shall be given by addressing the
same to the addresses of the respective parties referred to
herein, or to such other address as either party, and such
notice shall be deemed to have been given on the date when
same shall be deposited, so addressed, postage prepaid, in
the United States mail, or on the date when delivered, so
addressed, toll prepaid, to a telegraph or cable company.

- 8 -

14. This Agreement supersedes any and all prior negotiations, understandings, and agreements between the parties hereto with respect to the subject matter hereof. Each of the parties acknowledges and agrees that neither party has made any representations or promises in connection with this Agreement or the subject matter hereof not contained herein.

15. This Agreement may not be cancelled, altered, modified, amended or waived, in whole or in part, in any way, except by an instrument in writing signed by both Publisher and Writer. The waiver by Publisher of any breach of this Agreement in any one of more instances, shall in no way be construed as a waiver of any subsequent breach (whether or not of a similar nature) of this Agreement by Writer. If any part of this Agreement shall be held to be void, invalid or unenforceable, it shall not affect the validity of the balance of this Agreement. This Agreement shall be governed by and construed under the laws and judicial decisions of the State of Michigan applicable to agreements executed in and to be wholly performed therein.

16. This Agreement may not be assigned by Writer. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal and personal representatives.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

PUBLISHER
BRIDGEPORT MUSIC, INC.

BY _____
ARMEN BOLADIAN

WRITER _____

AO   104

## ADDENDUM TO WRITERS AGREEMENT

Notwithstanding anything to the contrary contained within the Writer Agreement dated the _2_ day of _DECEMBER_, 1983, by and between GEORGE CLINTON, hereinafter referred to as "Writer" and BRIDGEPORT MUSIC, INC., hereinafter referred to as "Publisher":

1. It is understood and agreed that it is the intention of Publisher and Writer that Writer shall be Publisher's "employee for hire" hereunder within the meaning of the United States Copyright Act of 1976, Title 17, U.S.C. (hereafter the "Copyright Act"); that each of the Compositions acquired by Publisher hereunder shall be a "work made for hire" within the meaning of the Copyright Act; and that, upon creation of each of the Compositions, all rights of whatsoever nature therein and thereto, and in and to each and every arrangement, version and adaptation thereof, shall vest in Publisher. Publisher shall have the right, in its sole discretion, to cause the Compositions to be copyrighted in the name of Publisher as author thereof, and/or in the name of Publisher's assignee or designee.

2. It is understood and agreed that the Writers Agreement is with respect to the songwriting services of Writer whether the songs are written in his own name or in an assumed name.

3. It is further understood and agreed that, notwithstanding the royalties provided for in the Writers Agreement, Writer hereby grants to Publisher the right to retain all royalties listed in Paragraph 7 of the Writers Agreement for its own account. This shall not, however, prevent Writer from receiving royalties from the American Society of Composers, Authors and Publishers (ASCAP) or Broadcast Music, Inc. (BMI) or any

public performance rights organization which pays performance royalties directly to songwriters.

4. It is understood and agreed that valuable consideration has been received by Writer with respect to the Writers Agreement and this Addendum.

IN WITNESS WHEREOF, the parties hereto have executed this Addendum as of the day and year first above written.

WITNESS:

PUBLISHER: BRIDGEPORT MUSIC, INC. by

ARMEN BOLADIAN

WRITER:

GEORGE CLINTON

EO 117

Agreement made and entered into this 4th day of March, 1982 by and between BRIDGEPORT MUSIC, INC. of 19631 W. Eight Mile Road, Detroit, Michigan (Hereinafter referred to as PUBLISHER) and MALBIZ MUSIC (Hereinafter referred to as OWNER).      (GEORGE CLINTON)

IN CONSIDERATION OF THE sum of Six Thousand($6,000.00) Dollars in hand paid to OWNER by Publisher, receipt whereof is hereby acknowledged and for other good as valuable consideration it is agreed:

1.  Owner warrants that it is the sole Owner of the music and lyrics constituting the musical composition(s) entitled:

| TITLE | COMPOSER | COPYRIGHT REG. NO. |
|---|---|---|
| GENERATOR POP | | |
| ATOMIC DOG | | |
| ONE FUN AT A TIME | | |
| DOG IS MAN'S BEST FREIND | | |
| GAMES | | |
| GET DRESSED | | |

(hereinafter referred to, in total, as "musical composition") and all rights therein and thereto, including the copyright therein, throughout the world, and that Owner has not in any way disposed of or encumbered the rights herein granted to Publisher.

(a)  to Owner one hundred (100%) percent of all monies actually received and earned by Publisher by reason of the sale or other distribution of any printed editions of the musical composition after deduction of payments to authors and/or composers pursuant to the cost of printing, processing and distributing said printed editions including charges of any sales agents employed to sell said printed editions.

IN WITNESS WHEREOF the parties have hereunto set their hands the day and year first above written.

_____
WITNESS

_____
OWNER: MALBIZ MUSIC
( GEORGE CLINTON)

_____
PUBLISHER: BRIDGEPO

EO    249

Hertz

EXHIBIT NO. 38
2.9.95
S. M. CHAMPA

## ADDENDUM

Notwithstanding anything to the contrary contained within the Agreement made and entered into the 4th day of March, 1982, by and between BRIDGEPORT MUSIC, INC. (hereinafter referred to as Publisher) and MALBIZ MUSIC (hereinafter referred to as Owner), it is agreed as follows:

1. Owner has assigned to Publisher the entire right, title and interest of every kind, nature and description including but not limited to the titles, words and music of any and all musical compositions listed on said Agreement and all rights to the results and proceeds of said musical compositions together with all world-wide copyrights and extensions thereof.

2. Owner also intended to, and does hereby, assign to Publisher all musical compositions previously written by George Clinton (prior to March 4, 1982, or such percentage of said musical compositions not vested by a binding written agreement in another publisher, including, but not limited to, those listed on Exhibit A annexed hereto and part hereof.

3. Owner agrees to execute and deliver to Publisher, upon demand, any and all instruments, papers and documents that may be requested by Publisher for the purpose of confirming, protecting and exercising any rights granted to Publisher hereunder. In the event of the failure or refusal of Owner to execute and deliver any of the same upon demand, Owner hereby authorizes and empowers Publisher as his attorney-in-fact to execute and deliver same in Owner's name. The power of attorney herein granted is coupled with

an interest and shall be irrevocable.  At such time as requested, Owner shall execute a short form assignment from Owner to Publisher with respect to all compositions covered under the Agreement  and Addendum dated March 4, 1982 in the form attached hereto as Exhibit B.

IN WITNESS WHEREOF, the parties have hereunto set their hands effective the 4th day of March, 1982.

WITNESS:

_____

_____

OWNER: MALBIZ MUSIC by:

_____
GEORGE CLINTON

PUBLISHER: BRIDGEPORT
          MUSIC, INC. by:

_____
ARMEN BOLADIAN

BQ    251

Get Dressed
Man's Best Friend
Loopzilla
Pot Sharing Tots
Computer Games
Atomic Dog
Free Alterations
One Fun at a Time
Put Your Own Puzzle Together
You Make Me Happy (You Got
  the Love I Need)
We Dance so Good Together
Hotel Eternity
Breakout
You Gotta Take Chances
Woo Together
I'll Be With You
Hold On
Much Thrust
Happy to Have (Happiness on
  Our Side)
Insurance Man for the Funk
(Reprise) Much Thrust
Up for the Down Stroke
Horny Horns
Pleasure Principle
Love Amnesia
Cookie Jar
Mrs. Understanding
Are You Dreaming
Mr. Melody Man
Booty Snatchers
Huff-n-Puff
Ridin' High
No Rump to Bump
Don't Ever Stop (Lovin' me -
  Needin' Me)
Ridin' High
Disco To Go
Warship Touchante'
Nappy
Birdie
Just Like You
When You're Gone
Amourous
Never Buy Texas (From a Cowboy)
Responsible
Party
Mother May I

Crush You
Trombipulation
Longer Way Around
Agony of Da Feet
Nu Doo Review
Lets Play House
Body Language
Peak-a-Groove
Electric Cuties
Electric Spanking
Funk Gets Stronger
(Glory Halla Stoopid) (Pin the Tale
  on the Funky)
Party People
Theme From the Black Hole
May We Bang You
Big Bang Theory
The Freeze (Sizzalean Mean)
Colour Me Funky
Freak of the Week
Knee Deep
Uncle Jam Wants You
Field Maneuvers
Think it Ain't Illegal Yet
Mt. Wiggles
Rumpotsteelskin
Water Sign
Aqua Boogie
One of Those Funky Thongs
Liquid Sunshine
The Motor Booty Affair
Deep
One Nation Under a Groove
Groovallegiance
Who Says a Funk Band Can't Play Rock
Promentolshitbackwashpsychosisenemasque
  (The Doo Doo Chasers)
Info You
Cholly (Funk Getting Ready to Roll)
Bop Gun
3 Blind Mice
Wizard of Finance
Funkentelichy
The Placebo Syndrome
Flashlight
This is the Way We Funk With You
Dr. Funkenstein
Children of Production
Star Child

Swing Down Sweet Chariot
P-Funk
The Landing (Off the Holy
  Mothership)
Fantasy is Reality
Gamin' on Ya
Children of Production
Dr. Funkenstein
Getting to Know You
Do That Stuff
I've Been Watching You
P-Funk (Wants to Get Funked Up)
Star Child
We Want the Funk (Tear The Roof Off)
Night of the Thumpasorus People
Super Groovalisticprosifunkstication
Up For the Down Stroke
The Goose
Adolescent Funk
If You Got Funk You Got Style
F    ate City
R_ _e On
Together
Side Effects
What Comes Funky
Let Me Be
If It Don't Fit
Big Footin

EXHIBIT "B"

TRANSFER OF COPYRIGHT

    For and in consideration of the sum of One Dollar ($1.00) and other

ɔod and valuable consideration, the receipt of which is hereby acknowledged,

ɪe undersigned (and each of them if there is more than one) hereby irrevo-

ɪbly transfers and assigns to   BRIDGEPORT MUSIC, INC.
_____

_____

ι the one hand, its successors and assigns, __one hundred__ percent ( __100__ %)

ɟ the entire worldwide copyright and any and all other rights, including

ɪy renewals and extensions of copyright and any and all other rights in

ɪd to the musical composition(s) now entitled:

| _TLE | WORDS/MUSIC BY | COPYRIGHT<br>REG. NO. (if an· |
|------|----------------|------------------------------|

      SEE  EXHIBIT  "A"

ɘreinafter referred to as the "Composition") including the title, music

ɪd lyrics thereof and all arrangements thereof and the right to arrange,

ɔ˕ɒ˖ and create derivative works from the Composition, together with all

ɔpyrights and any and all other rights therein and thereto throughout the

EXHIBIT 254

world, all under any law, statute, treaty or regulation heretofore, now or
hereafter existing, enacted or promulgated together with all claims, demand
and causes of action heretofore, now or hereafter existing for the use of :
Composition or infringement of the copyright therein or any other legal or
equitable right to the use and ownership thereof in any and all fields of
use now or hereafter existing throughout the world and otherwise through-
out the universe by any means or technology now known or hereafter existing

    This Transfer of Copyright is to be effective the 4th day of March,
1982 pursuant to the Agreement between BRIDGEPORT MUSIC, INC. and MALBIZ
MUSIC of the same date.

    IN WITNESS WHEREOF, the undersigned have caused this Transfer of
Copyright to be executed this _2nd_ day of _December_ , 198 _3_ .

MALBIZ MUSIC by:

_____
GEORGE CLINTON

_____
GEORGE CLINTON

STATE OF MICHIGAN)
               )SS
COUNTY OF OAKLAND)

On this _2nd_ day of _December_ , 198 _3_ , the above-named  person(s)
personally appeared before me and made oath that the above-stated is
true and correct to his/their knowledge and belief.

_____
Notary Public

_____ County
My Commission expires:

_____

DIANE I. SABO
Notary Public, Oakland County, MI
My Commission Expires Dec. 1, 1986

EQ  255

E

## EXCLUSIVE SONGWRITER'S AGREEMENT

AGREEMENT made this __4th__ day of April, 1985 by and betwee

George Clinton ("Writer") and Bridgeport Music, Inc. ("Publishe

FOR AND IN CONSIDERATION of the mutual covenants herein se

forth, the parties do hereby agree as follows:

1. Publisher hereby employs Writer, and Writer hereby

accepts such employment, to render Writer's exclusive services

in the writing and composing of original musical compositions,

numbers and works to Publisher for a period of five (5) years

from the date hereof (the "Term"), both alone and in collaborati

with others, as directed and required by Publisher in its sole

discretion.

2. It is understood and agreed that all compositions made

and created by Writer, alone or in collaboration with others

during the Term hereof (the "Compositions"), shall be the sole

property of Publisher, throughout the world, together with all

copyrights and all other rights of whatsoever nature therein, fo

and during the full term of said copyrights and any and all

extensions and renewals thereof.

Publisher and Writer affirm that it is their intention

that Writer shall be Publisher's "employee for hire" hereunder

within the meaning of the United States Copyright Act of 1976,

Title 17, USC (hereafter, the "Copyright Act"); that each of the

Compositions acquired by Publisher hereunder shall be a "work

made for hire" within the meaning of the Copyright Act; and that,

upon creation of each of the Compositions, all rights of whatso-

ever nature therein and thereto, and in and to each and every

arrangement, version and adaptation thereof, shall vest in Pub-

lisher, which rights shall include without limitation, the world-

wide copyrights therein and all termination and reversionary right


DEPOSITION EXHIBIT
Clinton
1-31-85     351

with respect thereto under the Copyright Act of otherwise, the right to secure copyrights throughout the world, and all other rights of whatsoever nature, both legal and equitable therein, thereto and thereunder, including but not limited to, the sole and exclusive world-wide publication, mechanical instrument, electrical transcription, and motion picture and television syn chronization rights, and the right of public performance for profit by any and all means and through any and all media, and all other rights now known or hereafter to become known. WRITE: shall, immediately after the creation of each of the Compositio: provide PUBLISHER with a lead sheet with respect thereto suitab for filing in the Copyright Office. PUBLISHER shall have the right, in its sole discretion, to cause the Compositions to be copyrighted in the name of PUBLISHER as author thereof, and/or in the name of PUBLISHER's assignee or designee.

3. During the term of this Agreement, WRITER shall not wri or compose, or furnish or dispose of, any musical compositions (including but not limited to, the Compositions) or any rights or interests therein, whatsoever other than for and to PUBLISHER

4. PUBLISHER shall have the right to use the name (real and assumed), photographs and likenesses of WRITER, and biograph cal material pertaining to WRITER in publicizing, advertising, exploiting, distributing and selling the Compositions.

5. WRITER shall not be entitled to receive any compensatio. or remuneration other than as in this Agreement specifically provided, and PUBLISHER, its assigns and licensees shall not be obligated to anyone in respect of the Compositions other than as in this Agreement specifically provided.

6. PUBLISHER undertakes to use its best efforts to exploit the Compositions and to derive maximum income therefrom. PUBLISHER, however, reserves the right to determine, in its sole discretion, the manner, extent and means of exploiting the Compo- sitions.

-2-

7. PUBLISHER shall pay to WRITER as total compensation fo
the services rendered by WRITER hereunder the following royalti
with respect to the Compositions:

(a) Six ($.06) cents per copy for each and every regu
piano-forte copy thereof published and sold by and paid for to
PUBLISHER in the United States and Canada.

(b) Ten (10%) percent of the wholesale selling price
(after trade discount, if any) for each and every printed copy
each and every other arrangement and edition thereof published
and sold by and paid for to PUBLISHER in the United States and
Canada, except that in the event the Compositions shall be used
or caused to be used in whole or in part in conjunction with one
or more musical compositions other than the Compositions in a
folio or album, WRITER shall be entitled to receive that propor-
tion of said ten (10%) percent which the Compositions shall bear
to the total number of musical compositions contained in such
folio or album. PUBLISHER shall not be required to pay any
royalties on professional or complimentary copies or any copies
which are distributed gratuitously to performing artists or
orchestra leaders or for advertising or exploitation purposes.

(c) Fifty (50%) percent of any and all net royalties
actually earned by the Compositions and actually received by
PUBLISHER from mechanical rights, electrical transcriptions,
reproducing rights, motion picture synchronization and televisior
rights, and all other rights (except as otherwise specifically
provided for herein) therein in the United States and Canada,
except that WRITER shall not be entitled to share in, nor shall
PUBLISHER be obligated to pay a royalty with respect to, any sum
or sums received by PUBLISHER from the American Society of
Composers, Authors and Publishers (ASCAP) or Broadcast Music,
Inc. (BMI) or any public performance rights organization which
pays performance royalties directly to songwriters. WRITER agree:
that PUBLISHER may deal with any affiliated record company under-
taking the effort and expense of recording and/or promoting

-3-

phonograph records embodying a Composition, on such terms as PUBLISHER shall in its reasonable business judgment deem proper, including the licensing of said Composition for mechanical use at less than the statutory rate therefor. PUBLISHER shall not be required to pay royalties earned by reason of the public performance of the Compositions; said royalties being payable onl by the performing rights society with which WRITER is or may in the future become affiliated.

(d) Fifty (50%) percent of any and all net royalties actually earned by the Compositions and actually received by PUBLISHER from sales and uses (other than public performance uses for which WRITER is paid by any public performance rights organization) of the Compositions in countries outside of the United States and Canada. It is understood that in such countries publication and/or other exploitation may be made by any affiliat‹ assignee, representative or licensee of PUBLISHER.

8. PUBLISHER agrees to pay to WRITER, or upon WRITER's death, to the person or persons legally entitled thereto, the royalties provided herein.

The royalties provided herein shall be paid to WRITER in those instances where WRITER is the sole creator and composer of the Composition. With regard to each of the Compositions created by WRITER with others, WRITER shall be paid only a portion of said royalties, which portion shall be determined by dividing the royalties payable by the total number of writers inclusive of WRITER, unless a different division of royalties is agreed upon by all such writers and written notice thereof, signed by all such writers, is furnished to PUBLISHER upon delivery to PUBLISHER of such a Composition.

9. PUBLISHER agrees that it will render statements and pay royalties due to WRITER withinninety (90) days after the last days of June and December of each year. The payment to be made shall be of all royalties earned by WRITER and due and owing at the end of such semi-annual periods. Said statements and payments, in the

-4-

absence of written objection thereto by WRITER within one (1)
year from receipt thereof, shall constitute an account stated
to all royalties due for the period covered by such statement
and/or payment. WRITER or a certified public accountant in his
behalf may, at WRITER's expense, at reasonable intervals, exami
PUBLISHER's books insofar as same concern WRITER, during
PUBLISHER's usual business hours and upon reasonable notice, fo
the purpose of verifying the accuracy of any statement renderec
to WRITER hereunder. PUBLISHER's books relating to activities
during any accounting period may only be examined as aforesaid
during the one (1) year period following service by PUBLISHER c
the statement for said accounting period. PUBLISHER's books ma
not be examined pursuant to this paragraph more than two (2)
times in any year.

10. WRITER hereby consents that this Agreement, the Compos
tions and all copyrights and other rights, granted PUBLISHER
hereunder, may be assigned by PUBLISHER either expressly or by
operation of law subject, however, to the payment of the royalt
to WRITER heretofore provided.

11. WRITER hereby agrees that during the Term of this
Agreement and any extension thereof, WRITER will obtain PUBLISH
approval of any person with whom WRITER shall collaborate.
PUBLISHER shall be deemed to approve any such collaborator who :
a member of the same performing rights society as WRITER and who
agrees, in writing, to grant to PUBLISHER upon the same royalty
terms, the same rights in the Compositions that are the subject
of such collaboration as PUBLISHER acquires from WRITER hereunde

12. WRITER warrants and represents and undertakes and agree
that each of the Compositions and each and every part thereof wi
be original and will not infringe upon any other musical or othe
material and that WRITER shall hold PUBLISHER and all other part
in interest harmless by reason of any and all claims in respect
thereof and any and all obligations incurred by PUBLISHER and al

-5-

other parties in interest and any and all disbursements and ex
ditures of every nature whatsoever made by PUBLISHER and all o
parties in interest in settling, paying and defending any and
all claims and any and all litigation arising therefrom.  PUBL
shall have the right, in the event of any claim arising out of
relating to any breach or alleged breach of this agreement by
WRITER, to withhold from WRITER sums due or to become due here·
to WRITER in amounts reasonably related to such claim, pending
disposition of such claim.  PUBLISHER and all other parties in
interest shall have the right to defend against any such claim:
and any and all actions and proceedings instituted upon the sar
and to settle the same before or after suit, for such amount ar
upon such terms as  PUBLISHER and all other parties in interest
shall, in its and their sole discretion, deem advisable.

13.  WRITER further warrants and represents that WRITER has
the full right, power and authority to enter into this Agreemer
and vest in PUBLISHER all of the rights granted PUBLISHER herei
free and clear of any and all claims, rights and obligations
whatsoever.

14.  It is specifically understood and agreed that the
services of WRITER to be rendered under this Agreement in writi
and composing are unique, exceptional and extraordinary and
cannot be replaced, and that in the event of violation by WRITE
of any of the terms, covenants or conditions of this Agreement,
PUBLISHER and all other parties in interest shall be entitled
to injunctive relief in addition to all other rights and remedi
It is further specifically understood and agreed that this Agre
ment is for the personal services of WRITER and that the obliga
tions of WRITER hereunder shall not, in any event, be discharge.
in any bankruptcy or insolvency proceedings or in any way be
affected thereby.  WRITER agrees to perform his services here-
under to the best of his ability, in a first class manner and
consistent with the highest standards of the music publishing
and songwriting industry, and WRITER will promptly and faithful:

-6-

comply with all reasonable requests and decisions made by PUBLISHER.

15. In respect of the Term, and each Option Year, WRITER will deliver to PUBLISHER not less than twelve (12)     complete compositions of marketable commercial quality newly-written by WRITER. The delivery of said Compositions shall be reasonably evenly spaced over the Term and each Option Year hereof respectively. At least one (1) Composition shall be delivered during each month of the Term and each Option Year. For purposes of tl paragraph:

(a) A Composition written or composed by WRITER in collaboration with others shall be treated as a fraction of a Composition by WRITER, the numerator of which fraction shall be one (1), and the denominator of which shall be the applicable number of writers and composers.

(b) "Marketable commercial quality" as used herein, shall in the event of a dispute between WRITER and PUBLISHER as to the meaning thereof with respect to any Composition written b WRITER, have such meaning with respect to such Composition as is determined by a panel consisting of one member chosen by WRITER and one member chosen by PUBLISHER and one impartial member selected by the performing rights society which controls the performing rights in the Composition.

16. WRITER hereby grants to PUBLISHER two (2) separate options, each to renew this Agreement for one (1) additional yea: ("Option Year(s)"), such Option Years to run consecutively begin· ning at the expiration of the Term, all upon the same terms and conditions applicable to the Term. Notwithstanding that each Option Year hereof shall run for a period of one (1) year, in the event that the Term of any Option Year shall be extended beyond· one (1) year by operation any of the provisions hereof, then such Option Year shall not expire until the expiration of the proceding Option Year plus one (1) year plus such extension(s); and no such extension(s) shall in any way shorten the duration of

-7-

any other Option Year. Each option shall be exercised automatically unless PUBLISHER notifies WRITER of PUBLISHER's intent to terminate this Agreement at least thirty (30) days prior to the date that the next Option Year would otherwise begin.

17. WRITER hereby consents to such changes, editing and arrangements of the Compositions as PUBLISHER deems desirable including the setting of words (English and/or foreign) to the music, and of music to the words, and the change of title. PUBLISHER shall have the right to copyright any such versions or derivative works in its own name and retain all rights therei for the full term of protection therein, and renew and extend such copyrights as provided within the Copyright Act.

18. Although PUBLISHER undertakes to use its best efforts to exploit the Compositions hereunder, PUBLISHER's failure to exploit any or all of said Compositions shall not be deemed a breach of this Agreement. PUBLISHER's rights and remedies pursuant to this Agreement shall be cumulative and PUBLISHER's exercise of its rights under any one provision of this Agreement or its rights at law shall not be deemed an election of remedies. The waiver by PUBLISHER or by any other party in interest through PUBLISHER of any of the terms or provisions of this Agreement in any one or more instances, shall not be deemed a permanent waiver thereof; such waived term or provisions shall therafter remain and continue in full force and effect.

19. PUBLISHER at its sole discretion may reasonably make studio facilities available for WRITER so that WRITER, subject to the supervision and control of PUBLISHER, may make demonstration records of musical compositions hereunder and also for WRITER to perform at such recording sessions when desired by PUBLISHER. WRITER shall not incur any liability for which PUBLISHER may be responsible in connection with any demonstration record session without having first obtained PUBLISHER's written approval as to the nature, extent and limit of such liability. In no event shall WRITER incur any expense whatsoever in behalf of PUBLISHER without

-8-

first having received written authorization from PUBLISHER. WRITER shall not be entitled to any compensation (in addition to such compensation as may be otherwise provided for herein) with respect to services rendered in connection with such demonstration record recording session. PUBLISHER shall advance the costs for the production of demonstration records, one-half (1/2) of such costs shall be doomed additional non-returnable advances to WRITE and shall be deducted from royalties payable to WRITER by PUBLISHER under this or any other agreement between the parties. All recordings and reproductions made at demonstration recording sessions hereunder shall become the sole and exclusive property of PUBLISHER, free of any claims whatsoever by WRITER or any person deriving any rights from WRITER.

20. WRITER shall, from time to time, at PUBLISHER's reasonable request, whenever the same will not unreasonably interfere with other professional engagements of WRITER, appear for photography, artwork and other similar reasons under the direction of PUBLISHER or its duly authorized agent, appear for interviews and other promotional purposes, and confer and consult with PUBLISHER regarding WRITER's services hereunder. WRITER shall also cooperate with PUBLISHER in promoting, publicizing and exploiting the musical compositions hereunder and for any other purpose related to the business of PUBLISHER. WRITER shall not be entitled to any compensation (other than applicable union scale if appropriate) for rendering such services, but shall be entitled to reasonable transportation and living expenses if such expenses must be incurred in order to render such services.

21. WRITER agrees to execute and deliver to PUBLISHER, upon demand, any and all instruments, papers and documents that may be requested by PUBLISHER for the purpose of confirming, protecting and exercising any rights granted to PUBLISHER hereunder. In the event of the failure or refusal of WRITER to execute and deliver any of the same upon demand WRITER hereby authorizes and empowers PUBLISHER as his attorney-in-fact to execute and deliver

-9-

same in WRITER's name. The power of attorney herein granted is coupled with an interest and shall be irrevocable.

22. Notwithstanding anything contained herein, all musical compositions previously written by WRITER and not vested by a binding written agreement in another publisher, including, but not limited to, those listed on Exhibit A, annexed hereto and made part hereof, are hereby deemed to have been written under and pursuant to this Agreement and to be "Compositions" hereunder provided, however, that said previously written musical compositions (hereafter, the "Other Compositions") shall be subject to the following additional terms and conditions.

Simultaneously with the execution hereof, WRITER shall execute a short form assignment from WRITER to PUBLISHER with respect to the Other Compositions in the form attached hereto as Exhibit B.

WRITER and PUBLISHER hereby acknowledge that the copyrights and certain other rights in the Other Compositions vested in PUBLISHER pursuant hereto may be terminated by WRITER or his successors (hereafter, individually and collectively, "WRITER") in accordance with the provisions of the Copyright Act. WRITER and PUBLISHER further acknowledge that it is their intention that in the event that any such copyrights and other rights are terminated by WRITER, PUBLISHER shall have the exclusive right of first refusal with respect thereto, which right of first refusal shall be exercised as follows.

Until expiration of a period of sixty (60) days following PUBLISHER's receipt of a valid notice of termination with respect to any such copyrights and other rights, WRITER shall not negotiate with any third party with respect to the grant, sale, assignment, license or other transfer thereof. During said sixty (60) day period, WRITER agrees to negotiate with PUBLISHER in good faith and to exert best efforts to reach agreement with PUBLISHER for PUBLISHER's acquisition of such copyrights and other rights.

-10-

## RIDER TO EXCLUSIVE SONGWRITER'S AGREEMENT

This Rider is to the Exclusive Songwriter's Agreement dated the 4th day of April, 1985 between Bridgeport Music, Inc. and George Clinton. This Rider is hereby made part of the Exclusive Songwriter's Agreement and each instance in which the provisions or any parts thereof of this Rider shall contradict or be inconsistent with provisions or any parts thereof of said Agreement as constituted without this Rider, shall prevail and govern and the contradicted or inconsistent provisions of said Agreement shall be deemed amended accordingly.

1. It is understood and agreed that the Exclusive Songwriter's Agreement is with respect to the songwriting services of George Clinton whether the songs are written in his own name or in an assumed name.

2. It is further understood and agreed that, notwithstanding the royalties provided for in the Exclusive Songwriter's Agreement, George Clinton hereby grants to Bridgeport Music, Inc. the right to retain all royalties listed in Paragraph 7 of the Exclusive Songwriter's Agreement for its own account. This shall not, however, prevent George Clinton from receiving royalties from the American Society of Composers, Authors and Publishers (ASCAP) or Broadcast Music, Inc. (BMI) or any public performance rights organization which pays performance royalties directly to songwriters.

3. It is understood and agreed that valuable consideration has been received by George Clinton with respect to the Exclusive Songwriter's Agreement and this Rider.

IN WITNESS WHEREOF, the parties hereto have executed this Rider as of the day and year first above written.

WITNESS: _____

PUBLISHER: BRIDGEPORT MUSIC, INC.

by _____
Armen Boladian

WRITER: _____
George Clinton

**DEPOSITION EXHIBIT**

Clinton 349
1-31-85

EXHIBIT "A"

OTHER COMPOSITIONS

LAW OFFICES HERTZ AND SCHRAM, P.C., 1000 N. WOODWARD, BIRMINGHAM, MI 48011 (313) 644-8903

## Assignment of Copyrights

LAW OFFICES HERTZ AND SCHRAM, P.C., 1060 N. WOODWARD, BIRMINGHAM, MI 48011 (313) 644-9905

F

## EXCLUSIVE EXECUTIVE PRODUCTION AGREEMENT

AGREEMENT made this ___4th___ day of April, 1985, by and among Nine Records, Inc. (hereinafter "Nine"), George Clinton (hereinafter "Clinton") and Egmitt, Inc. (hereinafter "Egmitt").

### WITNESSETH:

WHEREAS, Clinton and Egmitt intend to individually or jointly enter into recording contracts with record companies for the services of Clinton and other performing groups (hereinafter "Artists");

WHEREAS, Clinton and Egmitt wish to obtain advice, guidance, counsel and direction in the enhancement of their financial and artistic endeavors as a production company, musician, composer, arranger, producer, theatrical and performing artist in all aspects of the entertainment business;

WHEREAS, the nature and extent of the commercial and financial success or failure of Clinton's, Artists' and Egmitt's careers and enterprises cannot be predetermined and it is therefore their desire that Nine's compensation be determined in such manner as will permit Nine to accept the risk of failure and likewise benefit to the extent of Clinton's, Artists' and Egmitt's success; and

WHEREAS, Nine by reason of Nine's contacts, experience and background is qualified to render such advice, guidance, counsel and direction to Clinton and Egmitt;

NOW, THEREFORE, in consideration of the mutual promises herein contained and other valuable consideration which is hereby acknowledged, it is agreed and understood as follows:

1. **TERM**

(a) The Initial Term of this Agreement shall be for a period of five (5) years from the date hereof.

LAW OFFICES HERTZ AND SCHRAM, P.C., 1080 N. WOODWARD, BIRMINGHAM, MI 48011 (313) 644-9400

EQ 118

(b) Nine shall have the irrevocable option to renew this Agreement and extend the Initial Term for one (1) further consecutive renewal period of five (5) years. The option shall be exercised automatically unless Nine notifies Clinton and Egmitt of Nine's intent to terminate this Agreement at least thirty (30) days prior to the date that the option period would otherwise begin.

2. <u>SERVICES</u>

(a) Nine agrees to use a reasonable effort to render such advice, guidance, counsel and other services as Clinton and/or Egmitt may reasonably request and require to further Clinton's, Artists' and Egmitt's career as a musician, composer, arranger, producer, publisher, actor, writer and performing artist and to assist Clinton and Egmitt in their financial affairs, including but not limited to the following services:

(1) To be available at reasonable times and places to confer with Clinton and Egmitt in connection with all matters concerning Clinton's and Egmitt's professional career, business interests, employment and publicity; and

(2) To represent Clinton and Egmitt in all dealings with recording studios for the purpose of securing studio time at the most financially advantageous rates;

(3) To assist Clinton and Egmitt and Archie Ivy in managing the financial affairs of Clinton and Egmitt so as to profitably operate the business of Egmitt and Clinton's and Egmitt's careers; and

(4) To exercise all powers granted to Nine pursuant to Paragraph 3(a) hereof.

(b) Clinton and Egmitt hereby appoint Nine as Clinton and Egmitt's sole and exclusive Executive Producer in all matters usually and normally within the jurisdiction and authority of executive producers, including but not limited to the advice,

EQ 119

LAW OFFICES HERTZ AND SCHRAM, P.C. 1080 N. WOODWARD, BIRMINGHAM, MI 48011 (313) 644-8805

guidance, counsel and direction specifically referred to in Paragraph 2(a) hereof. Clinton and Egmitt agree to seek advice, guidance, counsel and direction from Nine and agree that they will not engage any other executive producer to render similar services, and that Clinton and Egmitt will not perform said services on their own behalf and Clinton and Egmitt will not negotiate, accept or execute any agreement, understanding or undertaking concerning Clinton's, Egmitt's or affiliated Artists' careers without Nine's express prior consent. Negotiations between Clinton and/or Egmitt and third parties, including but not limited to record companies, shall be conducted by Clinton and/or Egmitt under such terms as are mutually consented to or agreed to by Clinton, Egmitt and Nine. Clinton and/or Egmitt are not authorized to execute any agreement without such consent which shall not be unreasonably withheld. Clinton and/or Egmitt shall notify Nine prior to the signing of any and all recording agreements and provide Nine with a copy of the same so as to permit Nine to consult with Clinton and Egmitt with respect to the negotiations. All such recording contracts shall include a clause requiring the recording company to make payments of all funds through Nine Records and to provide copies of all royalty statements to Nine as well.

(c) Nine is not required to render exclusive services to Clinton, Artists and Egmitt or to devote the entire time of Nine or the entire time of any of Nine's employees to Clinton's and Egmitt's affairs. Nothing herein shall be construed as limiting Nine's rights to act as executive producer for other persons whose talents may be similar to or who may be in competition with Clinton and Egmitt or to have and pursue business interests which may be similar to or may compete with those of Clinton and Egmitt. Nine shall have the right to delegate production powers and responsibilities to others and to assign such production powers and responsibilities as well as to

3

assign this Agreement.

(d) Clinton and Egmitt covenant and agree not to appear nor allow Artists to appear in any field of public or private entertainment during the full term of this Agreement and any extensions thereof, for anyone or under the direction of anyone, directly or indirectly except Nine and under Nine's sole and exclusive supervision, and agrees further not to render recording services for any purpose except upon the written consent of Nine. Furthermore, Clinton and Egmitt agree to devote their full time efforts to the development and enhancement of Clinton's and other affiliated Artists' artistic careers.

(e) The services to be rendered by Nine and the compensation to be paid therefor shall include both George Clinton and his related entities and Artists, including, but not limited to, the "P-Funk Allstars", "Uncle Jam's Marching Band", "Funkadelic", "Parliaments", "Jimmy Giles", "Brides of Funkenstein", and all other "related entities" in the same sense as the specified Artists. Throughout this Agreement, these artists shall be referred to as "Artists".

3.   AUTHORITY

(a) During the term of this Agreement and any extensions, renewals, substitutions or modifications thereof, Nine is irrevocably authorized and empowered by Clinton and Egmitt to act on Clinton's, Artists' and Egmitt's behalf as their attorney-in-fact, in Nine's discretion, to do the following:

Collect and receive any and all compensation or other income or payments, as well as endorse Clinton's and/or Egmitt's name upon and cash any and all checks, payable to Clinton and/or Egmitt for Clinton's, Artists' and/or Egmitt's services, talents and literary and artistic materials and retain therefrom all sums owing to Nine and retain the balance in a Trust Account in Clinton's and/or Egmitt's name until it is paid to their accountant Ken Doshi, together with all interest, if any, earned

4

thereon (it being understood and agreed that Nine shall pay all such monies due to be turned over to the accountant promptly after receipt). All funds received by Ken Doshi from Nine, Clinton, Egmitt, Artists or any related party or corporation established by any of the preceding corporations or parties shall only be drawn from said account with the signature or authorization of both Armen Boladian and Archie Ivy. Prior to a withdrawal of funds by Ken Doshi or any other party in excess of One Thousand ($1,000.00) Dollars, a "deal memo" must be prepared and signed by both Armen Boladian and Archie Ivy other than the compensation and costs specifically authorized by this Agreement to be paid to Nine. Ken Doshi shall act in a fiduciary relationship and shall be the only person authorized to withdraw funds or write checks from the Trust Accounts.

(b) Nine agrees to maintain accurate books and records of all transactions concerning Clinton and Egmitt, which books and records may be inspected by a certified public accountant or other representative designated by Clinton and Egmitt, at their expense, upon reasonable written notice to Nine, at Nine's office in Michigan, during regular business hours and not more than two (2) times in any year.

(c) Nine shall furnish to Clinton and Egmitt, semi-annually, a semi-annual itemized accounting, of all gross monies or other considerations paid to Clinton and Egmitt or on their behalf during such period and all expenses and commissions deducted therefrom.

4. <u>LOANS AND ADVANCES</u>

Nine is not required to make any loans or advances to Clinton, Artists and/or Egmitt for their account, but in the event Nine does so, Clinton and/or Egmitt shall repay such loans or advances promptly upon request, and Clinton and/or Egmitt hereby authorizes Nine to deduct the amount of any such loans or advances from any sums Nine may receive for Clinton's, Artists'

5

EQ 122

and/or Egmitt's account under this Agreement. Their failure or delay in repaying any such loans, however, shall not be deemed a breach of this Agreement, but nothing herein contained shall prevent Nine from seeking all legal and equitable remedies Nine would otherwise have against Clinton and/or Egmitt to collect such debt, including Nine's rights pursuant to the immediately preceding sentence.

5. <u>CLINTON'S</u> <u>AND</u> <u>EGMITT'S</u> <u>CAREER</u> <u>AND</u> <u>WARRANTIES</u>

Clinton and Egmitt warrant that they are under no disability, restriction or prohibition with respect to their right to execute this Agreement and perform its terms and conditions. They warrant and represent that they will render services and perform such services as required. Clinton and Egmitt warrant and represent that no act or omission by them hereunder will violate any right or interest of any person or firm or will subject Nine to any liability, or claim of liability to any person. Clinton and Egmitt warrant and represent that the Artists' names to be used are the sole and exclusive property of Clinton and Egmitt. The registration and maintenance of a Trademark, Servicemark, or any component or variation thereof, shall be the responsibility of Clinton and Egmitt and shall be in Clinton's and/or Egmitt's names and at their expense. Clinton and Egmitt warrant and agree to exert their best efforts to further the Artists' careers during the term of this Agreement and to cooperate with Nine to the fullest extent in the interest of promoting Artists' careers. Clinton and Egmitt agree to indemnify Nine and to hold Nine harmless against any damages, costs, expenses, fees (including attorneys' fees) incurred or suffered by Nine in any claim, suit or proceeding instituted by or against Nine in which any assertion is made which is inconsistent with any warranty, representation or covenant of Clinton and/or Egmitt.

LAW OFFICES HERTZ AND SCHRAM, P.C. 1090 N. WOODWARD, BIRMINGHAM, MI 48011 (313) 644-8808

6

EQ 123

6. SCOPE; BREACH

This Agreement shall not be construed to create a partnership between the parties hereto. Clinton and Egmitt understand that Nine is acting hereunder as an independent contractor and Nine may appoint or engage any and all other persons, firms and corporations throughout the world in Nine's discretion to assist Nine in performing any or all of the services which Nine has agreed to perform hereunder, provided that Nine continues to personally oversee same at all times. In no event shall Nine be deemed to be in default hereunder unless and until Clinton and Egmitt shall first have given to Nine a written notice by certified mail, describing the exact service which is required hereunder, and then, a default shall only occur in the event that Nine shall thereafter fail, for a period of thirty (30) consecutive days from the date of receipt of such notice, to commence the rendition of the particular obligation required and which is called for by this Agreement; provided, however, that if such default cannot, by its nature, be completely cured in thirty (30) days, Nine shall only be required to initiate such steps within said 30 day period as are necessary to remedy such default; provided such default is remedied in due course thereafter.

Clinton and Egmitt acknowledge and agree that Nine's right to act as their sole and exclusive executive producer and their obligation to solely and exclusively use Nine in such capacity are unique, irreplaceable and extraordinary rights and obligations and that any breach or threatened breach by Clinton and/or Egmitt thereof shall be material and shall cause Nine immediate and unavoidable damages which cannot be adequately compensated for by money judgment. Accordingly, Clinton and Egmitt agree that, in addition to all other forms of relief and all other remedies which may be available to Nine in the event of any such breach or threatened breach by Clinton and/or Egmitt,

7

EO 124

LAW OFFICES HERTZ AND SCHRAM, P.C., 1090 N. WOODWARD, BIRMINGHAM, MI 48011 (313) 644-9800

Nine shall be entitled to seek and obtain injunctive relief against Clinton and/or Egmitt and they agree that in seeking such injunctive relief, Nine shall not be obligated to secure any bond or other security in connection with Nine's application for such relief. It is further agreed that this provision on the part of the Clinton and Egmitt is of the essence of this Agreement, that it is a material consideration for the entry by Nine into this Agreement, and that if this provision were not made by Clinton and Egmitt, Nine would not have entered into this Agreement.

In the event that Clinton and/or Egmitt shall fail for any reason to fulfill any obligation assumed by them hereunder (all of which obligations are agreed to be "of the essence" and material) Nine shall be entitled (by written notice mailed to Clinton and/or Egmitt at any time) to extend the duration of the Initial Term (or of the option in the event that such notice is mailed by Nine during the option period) for a period of time equal to the duration of such failure by Clinton and/or Egmitt and until Clinton and/or Egmitt shall fully cure any such failure. It is understood that no failure or delay of Nine to enforce the rights of Nine under this sub-paragraph shall be deemed a waiver of Nine's subsequent right to exert the rights granted to Nine hereunder.

7. COMPENSATON

(a) As compensation for services to be rendered hereunder, Clinton and Egmitt agree to pay to Nine and Nine shall receive from Clinton and Egmitt (it being understood and agreed that Nine shall receive Clinton, Artists' and Egmitt's gross earnings hereunder) during and throughout the term hereof, a sum equal to twenty-five (25%) percent of any and all gross monies or other considerations which Clinton, Artists and Egmitt may hereafter during the term earn (whether received during or after the term), receive, or acquire, or become entitled to, directly or indirectly, as a result of their activities in and throughout

8

EQ 125

the worldwide entertainment industries, including such activities
pursuant to engagements, employments and agreements now in
existence. In addition, Nine shall receive the equivalent of a
two (2%) percent royalty override, from the first record sold on
a worldwide basis, based upon retail sales (as defined in the
applicable recording contract) on all records released by Clinton
and/or the Artists after April 1, 1985. The royalties shall be
calculated in the same manner as the Artists' royalty paid by the
record company to which the Artists are under contract; that is,
for example, on a "Jimmy Giles" album, if the total royalties
payable to "Jimmy Giles" is fourteen (14%) percent of suggested
retail, then from that 14% Nine records would receive 2% of
suggested retail in addition to the twenty-five (25%) percent
compensation for services referred to above.

The 2% override royalty shall be applicable to all records
or sound recordings in all forms of recording and reproductions,
now known or which may hereafter become known, manufactured or
sold primarily for home and/or juke box use and/or use on or in
means of transportation, including without limitation, magnetic
recording tape, film, video recordings, compact discs and any
other medium or device for the reproduction of artistic
performances whether embodying sound alone or sound synchronized
with visual images. Any commissions that may be payable to
another executive producer, agent or manager(s) previously
utilized by Clinton and/or Egmitt and/or other corporations
controlled directly or indirectly by Clinton, (including, but not
limited to Nene Montes and Tercer Mundo, Inc.) are solely
Clinton's and Egmitt's responsibility and shall come one hundred
(100%) percent from Clinton's and Egmitt's share of such gross
monies or other considerations. Following the expiration or
termination of the term hereof, with respect to the proceeds of
any motion picture, phonograph record, sound recordings, video,
film, wire, transcription, recording or other reproduction

9

EQ    126

or result of Clinton's, Artists' or Egmitt's activities in the
entertainment industries which is created during the Term (or
thereafter pursuant to an engagement, contract, or agreement
subject to commission hereunder), Nine's commission shall
continue for so long as any of same are used, sold, leased or
otherwise exploited, whether during or after the Term.

      (b)   As used herein, the term "entertainment
industries" shall include, without limitation, any and all
aspects of the entertainment, amusement, music, recording,
producing, publishing, television, motion picture, nightclub,
concert, radio, literary and theatrical industries, and shall
also include any and all forms of advertising, endorsements,
merchandising, or other exploitations using Clinton's and/or
Egmitt's and/or Artists' name, photograph, voice, sound effects,
likeness, caricatures, talents or materials. The term
"activities" shall include, without limitation, Clinton's and/or
Egmitt's activities in any capacity whatsoever in the
entertainment industries, whether as a live performer,
songwriter, music publisher, recording artist, producer, author,
director, consultant or otherwise, and shall also include the use
of Clinton's and Artists' name, voice, likeness, etc. as
aforesaid. The term "gross monies or other considerations" shall
include, without limitation, salaries, earnings, fees, royalties,
residuals, repeat and/or re-run fees, non-<u>bona</u> <u>fide</u> gifts, (i.e.,
a disguised payment for services rendered in the entertainment
industries), bonuses, shares of profits, shares of stocks,
partnership interests, percentages, all sums resulting from
Clinton's, Artists' and Egmitt's activities in the entertainment
industries and uses of the results and proceeds thereof, payments
for termination of their activities, payments to refrain from any
such activities and payments in connection with the settlement or
other disposition of any dispute concerning such activities,
(after first deducting legal fees incurred in connection

10

therewith), which are earned or received directly or indirectly by Clinton, Artists or Egmitt or their heirs, executors, administrators or assigns, or by any other person, firm or corporation on their behalf, without deduction of any nature or sort.

In the event Clinton and/or Egmitt receives, as all or part of Clinton's and/or Egmitt's compensation for activities hereunder, stock or the right to buy stock in any corporation, Nine's percentage shall apply to Clinton's and Egmitt's stock or their right to buy said stock, and Nine shall be entitled to the percentage share thereof. Should Clinton and/or Egmitt be required to make any payment for such interest, Nine will pay Nine's percentage share of such payment, unless Nine does not want the percentage share thereof. In the event Clinton and/or Egmitt becomes the packager of any entertainment property or program, Nine and Clinton and/or Egmitt shall mutually agree, in good faith, upon what portion of the total package price Nine's commissions hereunder shall be based.

(c) Clinton and Egmitt shall assign to Nine, or its designee, Bridgeport Music, Inc. one hundred (100%) percent ownership right in the Copyright of any musical composition, the words and music of which were or shall be written or co-written, in part or in whole, by Clinton, any affiliated Artist or any individual comprising an affiliated Artist and which are recorded pursuant to any Recording Agreement signed or substantially negotiated during the term of this Agreement. The entire worldwide right, title and interest, including the Copyright, the right to Copyright and the renewal, in and to the Compositions shall be owned by Nine or its designee, Bridgeport Music, Inc.

The Compositions shall be registered for Copyright by Nine in the names of Nine and the Songwriter in the offices of the Register of Copyrights of the United States of America. If any Composition has heretofore been registered for Copyright in the

11

EQ 128

name of Clinton, or any individual(s) comprising an affiliated Artist, simultaneously herewith or at the time the Composition is recorded, Clinton, the affiliated Artist or the individual comprising the affiliated Artist, shall deliver to Nine an Assignment of the appropriate interests therein in a form acceptable to Nine. Any agreement Clinton or Egmitt enters into with any other entity, corporation or recording company shall not affect the one hundred (100%) percent interest of the entire Copyright that Nine shall be entitled to receive. This Paragraph is specifically intended to preclude Clinton, Egmitt and/or affiliated Artist(s) from assigning their publishing rights to another entity prior or subsequent to assigning a one hundred (100%) percent interest in such publishing to Nine.

(d) Notwithstanding anything to the contrary hereinbefore contained, (i) should the financial terms of any engagements, contracts or agreements, in connection with which Nine is otherwise entitled to a commission hereunder, be bettered after the term hereof, Nine shall only be entitled to Nine's commission hereunder based upon such terms as they existed prior to such betterment, and (ii) all references in the preceding Paragraph 7(c) to "agreements...substantially negotiated during the term of this Agreement" shall only refer to and include agreements actually consumated within nine (9) months after the termination hereof (with the understanding, however, that the fact that an agreement is consumated during said nine month period shall not in and of itself create a presumption that it was "substantially negotiated during the term"). If an "agreement" is otherwise commissionable pursuant to Paragraph 7(a) or 7(c) above, any extensions, renewals, or substitutions of such agreement shall likewise be commissionable at the same applicable rate.

(e) Clinton and Egmitt hereby assign to Nine an interest in all of their earnings commissonable to Nine hereunder

12

to the extent of the aforesaid percentages thereof. Said assignment is intended by Clinton and Egmitt to create an assignment coupled with an interest and Clinton and Egmitt will execute security agreements and financing statements in a form acceptable to Nine in order to secure all payments. It is understood and agreed that Nine shall receive all monies earned by Clinton and Egmitt hereunder, but in the event that Clinton and/or Egmitt receive any monies directly, they agree to immediately notify Nine thereof and to immediately transmit same to Nine. Egmitt and/or Clinton and/or Artists shall direct the applicable record companys to make all payments, including but not limited to recording budgets, recording funds, promotional advances, publishing advances, artist's royalties and publishing royalties directly to Nine. If, for any reason Egmitt and/or Clinton and/or Artists fails to notice the applicable record companys, Nine may do so directly and, if necessary, provide said recording company with a copy of this Agreement. With respect to Nine's right to notify the record companys directly that all payments shall be made through Nine Records, Nine is irrevocably authorized and empowered by Clinton and Egmitt to act on their behalf as their attorney-in-fact. Said power of attorney is irrevocable and coupled with an interest. Statements and payments as to Clinton's and/or Egmitt's gross earnings shall be delivered or sent to Nine by personal delivery or by registered or certified mail, to Nine's address at: Nine Records, 24361 Greenfield, Ste. 201, Southfield, MI 48075. Clinton and Egmitt agree that all gross yearly earnings and receipts shall be paid directly to Nine by all persons, firms or corporations and shall not be paid by such persons, firms or corporations to Clinton and/or Egmitt, and that Nine may withhold Nine's compensation therefrom and may reimburse itself therefrom for any fees, costs or expenses advanced or incurred by Nine pursuant to Paragraph 8 hereof. If Clinton and/or Egmitt nevertheless receive gross

13

EQ 130

yearly earnings and receipts directly, they shall be deemed to
hold in trust for Nine that portion of the gross yearly earnings
and receipts which equal Nine's compensation hereunder and such
disbursements incurred by Nine on behalf of Clinton and Egmitt.

    8.    EXPENSES.

        Clinton and Egmitt shall be solely responsible for
payment of all booking agencies fees, recording costs, union
dues, publicity costs, promotion or exploitation costs, traveling
expenses and/or wardrobe expenses and all other expenses, fees
and costs incurred by them.  In the event that Nine advances any
of the foregoing fees, costs or expenses on behalf of Clinton
and/or Egmitt, or incurs any other reasonable costs, fees or
expenses in direct connection with Clinton's and/or Egmitt's
professional career or with the performance of Nine's services
hereunder, Clinton and/or Egmitt shall promptly reimburse Nine
for such fees, costs and expenses.  Without limiting the
foregoing, such direct expenses, costs or fees incurred by Nine
shall include direct long-distance phone calls, legal fees
(including negotiating contracts), accounting fees, bookkeeping
expenses, road manager expenses, business manager fees and
expenses, promotion and publicity expenses, and travel and living
expenses and costs whenever Nine, in Nine's opinion, shall deem
it advisable to travel on Clinton and/or Egmitt's behalf outside
of the metropolitan Detroit area.

    9.    LIFE INSURANCE AND DISABILITY INSURANCE.

        Nine shall have the right during the term hereof to
obtain life insurance and/or disability insurance on Clinton's
life and/or employment at Nine's sole cost and expense, with Nine
being the sole beneficiary thereof.  Clinton agrees to fully
cooperate in connection with the obtaining of same and to submit
to a physical examination and complete any and all documents
reasonably necessary or desirable in respect thereof.  Clinton
hereby acknowledges that neither Clinton nor Clinton's  estate

14

shall have any right to claim the benefits of any such policy obtained by Nine.

10. PUBLICITY.

During the term hereof Nine shall have unrestricted rights to advertise and publicize Nine as Clinton's and Egmitt's executive producer.

11. CONFLICTING INTERESTS.

From time to time during the term of this contract, Nine, other persons or entities owned and/or controlled, directly or indirectly by Nine, or Nine's partners, shareholders, officers, directors and employees, whether acting alone or in association with others, may package an entertainment program in which Clinton or affiliated Artist(s) are employed as an Artist, or may act as the entrepreneur or promoter of an entertainment program in which Clinton is employed as an artist, or may employ Clinton or an affiliated Artist(s) directly in connection with the production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works, or may act as a booking agent or talent agency on behalf of Clinton and/or affiliated Artist with their consent. Such activity on Nine's part shall not be or be deemed to be a breach of this contract or of Nine's fiduciary obligations and duties to Clinton and Egmitt and shall not in any way affect Nine's right to commissions hereunder or under any such other agreement.

12. LITIGATION.

In the event of litigation hereunder the prevailing party shall be entitled to recover any and all reasonable attorneys' fees and other costs incurred in the enforcement of the terms of this Agreement or for the breach thereof.

13. OTHER ENTITIES.

Clinton and Egmitt shall cause any corporation, partnership, or other business entity which Clinton and/or Egmitt

15

EQ    132

or any of its officers now own or control or may hereafter own or control or in which Clinton and/or Egmitt has a direct or indirect interest of any nature or sort, or which is directly or indirectly controlled by Clinton and/or Egmitt or under the common control of them and others (hereinafter "firm") and which firm has a right to Clinton's, Artists' and/or Egmitt's services, to enter into an agreement with Nine on the same terms and conditions as contained in this Agreement, and Clinton and Egmitt agree that all gross monies or other considerations directly or indirectly earned or received by such firm in connection with Clinton's, Artists' and Egmitt's activities in the entertainment industries shall be subject to Nine's commission hereunder. Any agreement with such firm shall provide that such firm has a right to furnish Clinton's, Artists' and/or Egmitt's services on the same terms and conditions set forth in this Agreement and the firm shall become a party to this Agreement. Clinton and Egmitt shall personally guarantee the obligation of any such firm.

It is hereby acknowledged and agreed that Nine shall have the sole and exclusive right to be the executive producer of any and all members of any and all present and future musical or other groups of which Clinton and Artist(s) are now or may hereafter become a member and any replacement group therefor but only if such member(s) is a participant with Clinton, Artist and/or Egmitt in gross or net receipts derived from the services of Clinton or Artist(s) and such member(s) (collectively called "Group"). In furtherance of the foregoing, it is further agreed that if Clinton and/or Egmitt intends to form or to become part of a Group, Clinton and Egmitt shall inform all present and future members thereof of this Agreement and of the requirement that all such members of the Group (or any replacement Group thereof) be solely and exclusively produced by Nine hereunder. Clinton and/or Egmitt shall immediately inform Nine of the names and addresses of all such prospective members of the Group, and

16

shall immediately cause each such member of the Group to execute an executive production agreement with Nine in this form and containing the same terms and conditions as herein contained, and/or such other documents as Nine deems reasonably necessary or expedient to evidence or enforce its sole and exclusive production rights with respect to each such member of the Group. In the further event that at any time hereafter a new member is intended to be added to any such Group as a replacement or substitute for or in addition to Clinton and/or any other then-current member of the Group (collectively the "replacement member(s)"), Clinton and/or Egmitt shall immediately inform any such prospective replacement member of this Agreement and all of its terms and of Nine's exclusive right to be the sole and exclusive executive producer of all members of the Group, and shall immediately inform Nine of the name and address of any such prospective replacement member of the Group (or any replacement Group therefor), and shall immediately cause any such prospective replacement member to execute an executive production agreement with Nine in this form and containing the same terms and conditions as herein contained (except those terms peculiar to Clinton and/or Egmitt hereunder), and/or such other documents and/or terms as Nine deems reasonably necessary or expedient to evidence or enforce its sole and exclusive executive production rights with respect to each such replacement member. Clinton and Egmitt specifically agree that they will not form or join any group unless such group and each member thereof engages Nine as its and their exclusive executive producer and each member of such group executes a written agreement with Nine in this form under the terms and conditions herein contained (other than those particular terms applicable solely to Clinton and/or Egmitt).

Each member of Clinton and/or Egmitt and/or the Group acknowledges and agrees that the warranties and representations made by Clinton and/or Egmitt hereunder are joint and several. If

17

EQ    134

for any reason any member shall leave the Group, the leaving member shall not use the Group name or any other confusingly similar name in any manner thereafter.

14. APPLICABLE LAW.

This Agreement shall be deemed to be executed in Michigan and shall be construed in accordance with the laws of the State of Michigan governing contracts executed and to be wholly performed therein, and shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, and successors and to the assignees of Nine. In the event any provision hereof shall for any reason be invalid, illegal or unenforceable, then such provision shall be deemed amended only to the extent necessary to eliminate such invalidity, illegality or unenforceability and in any such event, the same shall not affect the validity of the remaining portion and provisions hereof; however, if any such invalidity, illegality or unenforceability materially affects Nine's right to compensation hereunder, Nine may at any time thereafter terminate the term of this contract.

15. NOTICES.

All notices hereunder shall be by prepaid telegram or cablegram or by certified or registered mail, return receipt requested, postage prepaid, and shall be sent to the following addresses, unless the parties notify each other as provided herein that notices shall be sent to a different address:

| Nine: | Clinton and Egmitt: |
|---|---|
| 24361 Greenfield, Ste. 201 | 839 Knapp Hwy. |
| Southfield, MI 48075 | Brooklyn, MI 49230 |

16. MISCELLANEOUS.

It is understood between the parties that a change in name of either of the entities or individuals signing this contract shall have no effect on the enforceability of this Agreement. It is intended and agreed that this contract shall be

18

EQ    135

binding on Clinton and any production company or entity he is obligated to provide services to in the entertainment industries. This contract constitutes the entire agreement between the parties relating to the subject matter hereof, all previous understandings, whether oral or written, having been merged herein. The headings of the Paragraphs hereof are for convenience only and shall not be deemed to limit or in any way affect the scope, meaning or intent of this contract or any portion thereof. This contract may not be changed or modified, or any covenant or provisions hereof waived, except by an agreement in writing, signed by the party against whom enforcement of the change, modification or waiver is sought.

IN WITNESS WHEREOF, the parties hereto have executed this Exclusive Executive Production Agreement the day and year first above written.

Nine Records, Inc. by:

Armen Boladian,
its President

George Clinton

Egmitt, Inc., by:

Stephanie Osborn , its President

19

EQ   136

Original - Court
1st Copy - Plaintiff

2nd Copy - Defendant

| STATE OF MICHIGAN | JUDGMENT | CASE NO. |
|---|---|---|
| **JUDICIAL DISTRICT** | Civil | |
| 39th **JUDICIAL CIRCUIT** | | 96-7197-CK |

Court address    425 N. Main Street, Adrian, Michigan 49221          Court Telephone no.    (517) 264-4661

| Plaintiff(s) | | Defendant(s) |
|---|---|---|
| ARMEN BOLADIAN | **v** | GEORGE CLINTON |

STEVEN J. LANTING (P51366)
246 N. Winter St., P. O. Box 665
Adrian, Michigan 49221
517/265-7161

☒ **JUDGMENT**

**FOR:**   Plaintiff Armen Boladian

**Plaintiff/Attorney**

ULYSSES W. BOYKIN (P11082)
Lewis & Munday, P.C.
1300 First National Building
Detroit, Michigan 48226

**AGAINST:**   Defendant George Clinton

X **Summary Disposition**
☐ After trial          ☐ Consent
☐ Non appearance default

☐ **DISMISSAL**
☐ Without prejudice    ☐ With prejudice

**Defendant/Attorney**

**ORDER OF JUDGMENT**

| | | |
|---|---|---|
| Damages | $1,193,500.00 | Other conditions if any: |
| Interest | $0.00 | |
| Costs | $0.00 | |
| Other (specify) | $0.00 | |
| Judgment | $1,193,500.00 | |

This judgment will earn interest at current statutory rates.

FILED
39TH CIRCUIT COURT

NOV 18 1997

...NTSCHLY
...ERK ADRIAN MI

☐ A note or other written evidence of indebtedness has been filed with the clerk for cancellation.

☐ Approved as to form, notice of entry waived.

**IT IS ORDERED**   that this judgment is granted.

11/18/97
Judgment date

_Litilia M. Koselka_
Judge/Court clerk                                      Bar no.

Plaintiff/Attorney                                      Defendant/Attorney

Judgment has been entered and will be final unless within 21 days of judgment date a motion for new trial or an appeal is filed.

**CERTIFICATE OF MAILING**

I certify that a copy of this judgment was served upon the other party(ies) or their attorney(s) by ordinary mail at the above address(es).

11/19/97
Date

FILED
39th CIRCUIT COURT

NOV 19 1997

LOU ANN BLUNTSCHLY
LENAWEE CITY CLERK ADRIAN MI